**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**FORT PIERCE DIVISION**

**Case No. 2:20-cv-14058-ROSENBERG/MAYNARD**

_____ )
GUSTAVO CORTEZ-ROMERO,                                    )
LUIS GERARDO ALVAREZ-ALONSO,                       )
NOE BADILLO-FLORES,                                             )
SABINO CAMPUZANO-DOMINGA,                          )
ROMAN CAMPUZANO-SOLANO,                            )
ADAN CASTRO-GUERRERO,                                    )
MIGUEL ANGEL CERECEDO-RODRIGUEZ, )
DIEGO CRUZ-CRUZ,                                                   )
QUIRINO EUGENIO-LUGO,                                      )
LEOBARDO GONZALEZ-OLVERA,                        )
ALFREDO LUGO-GARCIA,                                        )
FIDENCIO MARTINEZ-GREGORIO,                       )
OSCAR MERIDA-GODINEZ,                                     )
MIGUEL ANGEL MORALES-TELLEZ,                    )
EDUARDO RODRIGUEZ-CRUZ,                             )
CASIMIRO RODRIGUEZ-ESCOBAR,                      )
BERNARDO SANTIAGO-ZARAGOZA,                    )
BONIFACIO VILLEGAS-CERECEDO, and           )
EDUARDO YAÑEZ-YAÑEZ,                                     )
                                                                                          )
            Plaintiffs,                                                         )
                                                                                          )
v.                                                                                      )
                                                                                          )
MARIN J CORP and                                                   )
JORGE J. MARIN,                                                      )
                                                                                          )
            Defendants.                                                    )
_____ )

**SECOND AMENDED COMPLAINT**

**PRELIMINARY STATEMENT**

1.     This is an action by 19 migrant agricultural workers ("Farmworkers") who were recruited by Marin J Corp ("Marin J") and Jorge J. Marin (together, "Defendants") to harvest watermelons, cantaloupes, and pumpkins in Missouri during the summer of 2018. Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores also worked with Defendants' crews in Florida during 2018. Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio harvested apples with Defendants' crew in North Carolina in the fall of 2018.

2.     By and through their agents in Mexico, Defendants lured the Farmworkers to the United States with fraudulent promises regarding the wages and living conditions. After being forced to pay illegal recruitment fees to Defendants' agents in Mexico, the Farmworkers obtained visas through the federal government's H-2A temporary agricultural worker program and traveled to Defendants' jobsites at their own expense. Many of the Farmworkers took out loans to cover their expenses to obtain the visas and travel to the United States. Although federal law required Defendants to reimburse the Farmworkers for their pre-employment transportation and visa expenses, Defendants failed to do so. Instead, Defendants issued checks to a number of the Farmworkers for part of these expenses but required these workers to kick back these reimbursement payments.

3.     The Farmworkers were employed harvesting, loading, transporting, grading, and packing watermelons with Defendants' labor crew during the 2018 southeastern Missouri watermelon harvest. Throughout this period, Defendants paid the Farmworkers wages well below those promised in their employment contracts and required by federal and state law.

4.     Defendants engaged in a systematic scheme of coercion and threats to force the Farmworkers and other crewmembers to continue working. Defendants did not pay the

Farmworkers the promised wages, but instead significantly underpaid them, thereby maintaining them in a state of indebtedness and rendering them financially unable to leave. Defendants housed the Farmworkers in seriously substandard accommodations, including the former Dunklin County jail. Defendants maintained close surveillance over the Farmworkers' activities to ensure that they neither notified law enforcement personnel about the deplorable conditions nor escaped or otherwise left employment with the Marin J crew. In an attempt to confine the Farmworkers to Defendants' employ and ensure the Farmworkers performed labor and provided services on Defendants' terms, Defendants and their agents threatened to deport, extort, blacklist, and inflict harm on the Farmworkers and their families abroad. Under these circumstances, for most of the Farmworkers the only meaningful option was to remain and work.

5.      In order to conceal their unlawful activities and forced labor scheme, Defendants and their agents ordered the Farmworkers to not discuss the substandard pay and conditions when they were interviewed by U. S. Department of Labor ("DOL") officials investigating the situation. Defendants enforced these directives with threats of deportation, blacklisting, and physical harm to the Farmworkers and their families.

6.      Defendants violated the Fair Labor Standards Act ("FLSA") by failing to pay each of the Farmworkers at least the required minimum hourly wage for every compensable hour of labor performed in a workweek and by failing to pay overtime wages as required by law.

7.      Defendants breached their employment contracts with the Farmworkers by, among other things, failing to pay promised wages, providing the Farmworkers with substandard accommodations, and failing to comply with applicable field sanitation regulations and standards.

8.      Defendants violated the Trafficking Victims Protection Reauthorization Act ("TVPRA") by knowingly obtaining the Farmworkers' labor through threats of force, serious harm, and abuse of legal process to the Farmworkers and their families and by benefitting financially from this forced labor scheme.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 29 U.S.C. § 216(b) (FLSA), 18 U.S.C. § 1595(a) (TVPRA), and 28 U.S.C. § 1331 (subject matter jurisdiction). This action is authorized and instituted pursuant to these statutory provisions.

10.     This Court has supplemental jurisdiction over the Farmworkers' state law causes of action pursuant to 28 U.S.C. § 1367(a), including claims for breach of contract and for violations of the Florida Minimum Wage Act, Fla. Stat. § 448.110(6)(a), Missouri wage payment law, Mo. Rev. Stat. § 290.527, and North Carolina Wage and Hour Act, N.C.G.S. § 95-25.6. These state law claims are so related to the federal claims that they form part of the same case or controversy.

11.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Defendant Jorge J. Marin is a resident of Avon Park, Highlands County, Florida. Defendant Marin J maintains its principal place of business in Avon Park, Highlands County, Florida.

## PARTIES

13.     Plaintiff Farmworkers are citizens of Mexico. Each of them was admitted to the United States in 2018 on a temporary basis pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(H)(ii)(a),  in order to perform agricultural labor for Marin J. The

Farmworkers received H-2A visas pursuant to this statutory provision and were lawfully employed by Defendants under these visas.

14.     Defendant Marin J is a Florida corporation headquartered in Avon Park, Florida. In 2018, Marin J was an H-2A labor contractor within the meaning of the H-2A regulations, 20 C.F.R. § 655.103(b), in that, in exchange for valuable consideration, it recruited, solicited, hired, transported, and furnished H-2A workers for agricultural employment. Marin J was an employer of the Farmworkers, whom it employed as its employees, in 2018 within the meaning of the H-2A Program, 20 C.F.R. § 655.103, the FLSA, 29 U.S.C. § 203(d), and the Missouri wage payment law, Mo. Rev. Stat. § 290.500(4). Marin J hired the Farmworkers, directed and supervised their daily work activities, assigned them their tasks on a daily basis, and paid them wages for their labor.

15.     Defendant Jorge J. Marin, also known as Jorge Jovan Marin-Gomez, is a resident of Avon Park, Florida. He is the owner, president, and sole officer of Defendant Marin J, and he directed and controlled Marin J's activities in 2018 on a daily basis. In 2018 Jorge J. Marin was an H-2A labor contractor within the meaning of the H-2A regulations, 20 C.F.R. § 655.103(b), in that, in exchange for valuable consideration, he recruited, solicited, hired, transported, and furnished H-2A workers for agricultural employment.

16.     Jorge J. Marin was an employer of the Farmworkers in 2018 within the meaning of the FLSA, 29 U.S.C. § 203(d), the H-2A regulations, 20 C.F.R. § 655.103(b), and the Missouri wage payment law, Mo. Rev. Stat. § 290.500(4), because, among other things, he determined what tasks the Farmworkers would perform each day, supervised the Farmworkers' performance of their assigned tasks, and paid the Farmworkers wages for their labor. As a joint

employer, Jorge J. Marin was contractually bound, along with Marin J, to the Farmworkers by the terms of their employment contracts.

## FACTS

### The Federal H-2A Visa Program

17.     The H-2A program was created by the Immigration and Nationality Act, 8 U.S.C. § 1188, and is implemented through regulations set out at 20 C.F.R. §§ 655.100 to 655.185 and 29 C.F.R. §§ 501.0 to 501.47. The H-2A program authorizes the admission of non-immigrant workers to perform agricultural labor or services of a seasonal or temporary nature.

18.     An agricultural employer in the United States may import aliens to perform labor of a temporary nature if the DOL certifies that (1) there are insufficient available workers within the United States to perform the job, and (2) the employment of aliens will not adversely affect the wages and working conditions of similarly-situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1); 20 C.F.R. § 655.100. Aliens admitted in this fashion are commonly referred to as "H-2A workers."

19.     Employers seeking the admission of H-2A workers must first file a temporary labor certification application with the DOL. 20 C.F.R. § 655.130. This application must include a job offer, commonly referred to as a "clearance order" or "job order," complying with applicable regulations. 20 C.F.R. § 655.121(a)(1). Federal regulations establish the minimum benefits, wages, and working conditions that must be offered by the petitioning employer in order to avoid adversely affecting similarly situated U.S. workers. 20 C.F.R. §§ 655.120, 655.122 and 655.135. Among these terms are the following:

      a.      For every hour or portion thereof worked during a pay period, the employer must pay the workers the highest of the adverse effect wage rate

("AEWR"), the prevailing wage for the work in the geographic area where the work is to be performed, the federal minimum wage, or the state minimum wage. 20 C.F.R. § 655.120. During the times when Farmworkers were employed by Defendants, the AEWR was $11.29 per hour for Florida work, $13.42 per hour for Missouri work, and $11.46 per hour for North Carolina work.

b.      The employer must provide housing at no charge to the H-2A workers. All employer-provided housing must meet applicable federal standards. 20 C.F.R. § 655.122(d)(1), 29 C.F.R. § 1910.142, and 20 C.F.R. § 654.400(b).

c.      The employer must either furnish free and convenient cooking and kitchen facilities or provide each worker with three meals per day. 20 C.F.R. § 655.122(g). If the employer provides meals to the workers, the charges may not exceed those established by 20 C.F.R. § 655.173. The allowable meal charge during the 2018 Missouri fruit and vegetable harvest season was $12.26 per day.

d.      For those workers who complete the first 50 percent of the work contract, the employer must pay for transportation costs from the worker's home to the employer's jobsite not previously reimbursed, as well as daily subsistence en route. 20 C.F.R. § 655.122(h)(1).

e.      For those workers who complete the contract period, the employer must provide or pay for transportation from the worksite to the worker's home, as well as pay for or provide subsistence en route. 20 C.F.R. § 655.122(h)(2).

f.      All transportation provided the H-2A workers must at a minimum provide the same vehicle insurance as required under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1841, 29 C.F.R. §

- 7 -

500.105, and 29 C.F.R. §§ 500.120 to 500.128. *See* 20 C.F.R. § 655.122(h)(4). An employer seeking to satisfy its vehicle insurance obligations by using worker's compensation in lieu of vehicle insurance or a liability bond must either ensure that the worker's compensation covers all travel or that vehicle insurance or a liability bond exists to provide coverage for travel not covered by worker's compensation. 29 U.S.C. § 1841(c); 29 C.F.R. § 500.122(h)(4).

g.      The workers must be guaranteed employment for at least three-fourths of the workdays covered by the clearance order, including any extensions, and if this amount of work is not offered, the workers must be paid the amount they would have earned had they been employed for the guaranteed number of days. 20 C.F.R. § 655.122(i).

h.      The employer must keep accurate and adequate records with respect to the workers' earnings, the daily starting and stopping times for work, and deductions from wages. 20 C.F.R. § 655.122(j).

i.      The employer must furnish each worker on payday a written statement of his hours and earnings containing, among other things, the hours of work offered, the hours actually worked, and the piece-work units produced daily by the employee during that pay period. 20 C.F.R. § 655.122(k).

j.      The working conditions must comply with federal, state, and local laws and regulations, including minimum wage laws and health and safety laws. 20 C.F.R. § 655.135(e); 20 C.F.R. § 501(c)(3)(iii).

k.      Neither the employer nor its agents will seek or receive payment of any kind from the H-2A workers for recruitment costs. 20 C.F.R. § 655.135(j).

l.      The employer must contractually forbid any foreign labor recruiter whom he engages in international recruitment of H-2A workers from seeking or receiving payments from prospective employees. 20 C.F.R. § 655.135(k).

20.      The clearance order also functions as an employment contract between the agricultural employer and the H-2A workers. 20 C.F.R. § 655.122(q).

**Marin J's 2018 Participation in the H-2A Visa Program**

21.      In or about September of 2017, Marin J submitted a temporary labor certification application to the Office of Foreign Labor Certification of the DOL's Employment and Training Administration ("ETA") seeking admission of 75 workers to harvest citrus fruit and blueberries in central Florida from November 17, 2017 through June 1, 2018 (ETA case number H-300-17326-429366). The temporary labor certification application was signed on behalf of Marin J by Jorge J. Marin.

22.      In early 2018, Marin J submitted two separate temporary labor certification applications to the Office of Foreign Labor Certification of the DOL's ETA seeking workers to harvest watermelons in Florida. One application sought admission of 28 workers for employment in central Florida from April 25, 2018 through June 3, 2018 (ETA case number H-300-18068-884338). The second application requested admission of 40 workers for employment in north Florida from May 15 through June 25, 2018 (ETA case number H-300-18078-495864). Both labor certification applications were signed on behalf of Marin J by Jorge J. Marin.

23.      In or about April 2018, Marin J submitted two separate temporary labor certification applications to the Office of Foreign Labor Certification of the DOL's ETA seeking workers to harvest and pack watermelons in southeastern Missouri. One application sought admission of 27 workers for employment from June 25, 2018 through August 17, 2018, with the

workers scheduled to be housed at 200 Slicer Street, Kennett, Missouri (ETA case number H-300-18102-843410). The second application requested the admission of 80 workers for employment from June 25, 2018 through October 20, 2018, with the workers scheduled to be housed at the 84 West Motel, 1433 Saint Francis Street, Kennett, Missouri (ETA case number H-300-18124-947696). Both of these temporary labor certification applications were signed on behalf of Marin J by Jorge J. Marin.

24.     In or about July 2018, Marin J submitted a temporary labor certification application to the Office of Foreign Labor Certification of the DOL's ETA seeking workers for employment in North Carolina harvesting apples and hemp. The application sought admission of 15 workers to harvest apples and hemp near Hendersonville, North Carolina from August 8, 2018 through November 10, 2018 (ETA case number H-300-18169-075975). The temporary labor certification application was signed on behalf of Marin J by Jorge J. Marin.

25.     Each of the temporary labor certification applications described in Paragraphs 21, 22, 23, and 24 explicitly and implicitly incorporated the DOL's regulations at 20 C.F.R. § 655 Subpart B, including the terms described in Paragraph 19.

26.     As part of the temporary labor certification applications described in Paragraphs 21, 22, 23, and 24, Defendants submitted clearance orders that contained certifications that the orders described the actual terms and conditions of employment being offered and contained all material terms of the job, as required by 20 C.F.R. § 653.501(c)(3)(viii).  Each of these certifications was signed on behalf of Marin J by Jorge J. Marin.

27.     A true and correct copy of the clearance order (ETA case number H-300-18102-843410) submitted by Defendants as part of its request for 27 workers for employment in Missouri from June 25, 2018 through August 17, 2018 is attached as Exhibit A.

28.     A true and correct copy of the clearance order (ETA case number H-300-18124-947696) submitted by Defendants as part of its request for 80 workers for employment in Missouri from June 25, 2018 through October 20, 2018 is attached as Exhibit B.

29.     The DOL accepted the temporary labor certification applications and clearance orders submitted on behalf of Marin J as described in Paragraphs 21 through 28. The clearance orders were circulated to local job service offices in an effort to recruit U.S. workers to fill the positions offered.

30.     On or about January 8, 2018, the DOL's National Processing Center ("NPC") granted in full Marin J's temporary labor certification application seeking 75 workers for employment harvesting citrus fruit and blueberries in central Florida from November 17, 2017 through June 1, 2018. U.S. Citizenship and Immigration Services ("USCIS") of the Department of Homeland Security in turn issued H-2A visas to fill the manpower needs described in the temporary labor certification application and accompanying clearance order.

31.     On or about April 18, 2018, the DOL's NPC granted in full Marin J's temporary labor certification application seeking 28 workers for employment harvesting watermelons in central Florida from April 25, 2018 through June 3, 2018. On or about May 17, 2018, the DOL's NPC granted in full Marin J's application seeking 40 workers for employment harvesting watermelons in north Florida from May 15 through June 25, 2018. USCIS in turn issued H-2A visas to fill the manpower needs described in these temporary labor certification applications and accompanying clearance orders.

32.     On or about May 24, 2018, the DOL's NPC granted in full Marin J's temporary labor certification application seeking 27 workers for employment harvesting and packing watermelons in Missouri from June 25, 2018 through August 17, 2018. USCIS in turn issued H-

2A visas to fill the manpower needs described in the temporary labor certification application and accompanying clearance order (Exhibit A).

33.     On or about June 8, 2018, the DOL's NPC granted in full Marin J's temporary labor certification application seeking 80 workers for employment harvesting, loading, transporting, grading and packing watermelons, cantaloupes, and pumpkins in Missouri from June 25, 2018 through October 20, 2018. USCIS in turn issued H-2A visas to fill the manpower needs described in the temporary labor certification application and accompanying clearance order (Exhibit B).

34.     On or about July 23, 2018, the DOL's NPC granted in full Marin J's temporary labor certification application seeking 15 workers for employment harvesting apples and hemp in North Carolina from August 8, 2018 through November 10, 2018. USCIS in turn issued H-2A visas to fill the manpower needs described in the temporary labor certification application and accompanying clearance order.

35.     Defendants failed to contractually forbid its agents and recruiters whom Defendants engaged to recruit potential H-2A workers to fill the manpower requirements of the temporary labor certification applications described in Paragraphs 21, 22, 23, and 24 from seeking or receiving payments from prospective employees.

## Recruitment, Travel, and Arrival in Florida of Diego Cruz-Cruz and Alfredo Lugo-Garcia

36.     Defendants recruited and hired Plaintiffs Diego Cruz-Cruz, Alfredo Lugo-Garcia, and other individuals in Mexico to fill the central Florida citrus and blueberry harvesting jobs described in Defendants' temporary labor certification application referenced in Paragraph 21. This was the first time that Plaintiff Diego Cruz-Cruz had ever come to the United States on an H-2A visa.

37.     Plaintiff Diego Cruz-Cruz undertook considerable economic, familial, and personal sacrifices, including borrowing many thousands of pesos, to be able to afford the expenses required to come to the United States to work for Defendants.

38.     As a condition for being selected to receive H-2As visas for the citrus and blueberry jobs described in their temporary labor certification application referenced in Paragraph 21, Defendants required Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia to each pay a recruitment fee to Defendants' agents in Mexico, in violation of 20 C.F.R. § 655.135(j).

39.     After being recruited and hired by Defendants, Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia each traveled at his own expense from his home to Matamoros, Tamaulipas, Mexico, where they were interviewed at the U.S. Consulate and issued H-2A visas. Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia entered the United States at Brownsville, Texas on or about February 15, 2018 and traveled at their own expense from Brownsville to Defendants' jobsite in central Florida. Upon their arrival in central Florida, Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia were employed harvesting citrus fruit and blueberries as members of Defendants' agricultural labor crew pursuant to Defendants' temporary labor certification application described in Paragraph 21.

40.     Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia incurred and paid a number of expenses in conjunction with obtaining H-2A visas and entering the United States to come to work in Florida for Defendants. These expenses included transportation from their respective homes to Matamoros and from Matamoros to Defendants' jobsite, lodging expenses while in Matamoros awaiting the processing of their visa applications, a fee for assistance in completing their visa applications and related documents, and a $6.00 (U.S.) fee paid at the U.S./Mexico

border for issuance of an arrival-departure document referred to as Form I-94. The Form I-94 was necessary for these Plaintiffs to enter the United States and work for Defendants.

41.     The expenses incurred and paid by Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia as described in Paragraph 40 were incurred primarily for the benefit or convenience of Defendants within the meaning of the regulations implementing the FLSA, 29 C.F.R. § 531.3(d)(1).

**Florida Citrus and Blueberry Employment of Diego Cruz-Cruz and<br>Alfredo Lugo-Garcia**

42.     From approximately February through May of 2018, Defendants employed Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia harvesting citrus fruit and blueberries for sale in interstate commerce. The temporary labor certification application described in Paragraph 21 and the accompanying clearance order served as the employment contract between Defendants and Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia with respect to this employment. 20 C.F.R. § 655.122(q).

43.     Defendants never reimbursed Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia for the expenses described in Paragraph 40. As a result, the wages of each of these workers for their respective first workweeks of employment with Defendants' crew were less than the federal minimum wage rate, the Florida minimum wage, and the applicable AEWR.

44.     Although Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia each worked for Defendants through the conclusion of the Florida contract period, Defendants never reimbursed them for their inbound transportation and subsistence expenses as promised in these workers' employment contracts and required by 20 C.F.R. § 655.122(h)(1).

45.     During the 2018 central Florida citrus and blueberry harvests, Defendants transported Plaintiffs Diego Cruz-Cruz, Alfredo Lugo-Garcia, and the other members of their

harvesting crew between the jobsite and their living quarters each day in various vans and buses

owned by Defendants. These same vehicles were used by Defendants to transport Plaintiffs

Diego Cruz-Cruz, Alfredo Lugo-Garcia, and the other crewmembers to nearby stores to purchase

foodstuffs and to laundromats to wash their clothes.

46.     At no time during the 2018 central Florida citrus and blueberry harvest did

Defendants have in effect an insurance policy in the amounts prescribed by 29 C.F.R. §

500.121(b) or a liability bond meeting the requirements of 29 C.F.R. § 500.124 that insured

either of them against liability for damage to persons or property arising from the operation of

the vehicles described in Paragraph 45. Instead, Defendants sought to satisfy the vehicle

insurance requirements of 20 C.F.R. § 655.122(h)(4) through a worker's compensation insurance

policy issued to Harbor America Florida, a professional employer organization that Defendants

hired to provide payroll and other services with respect to Defendants' employees.

47.     The workers' compensation policy maintained by Harbor America Florida and

referenced in Paragraph 46 did not cover all travel provided by Defendants to Plaintiffs Diego

Cruz-Cruz, Alfredo Lugo-Garcia, and the other crew members employed during the 2018 central

Florida citrus and blueberry harvests. It did not cover travel during periods when the passengers

were not actively engaged in harvesting activities, such as travel to stores and laundromats, or

interstate trips between jobsites in different states.

48.     Defendants failed to maintain payroll records accurately recording all

compensable hours worked by Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia in the

central Florida citrus and blueberry harvests. Defendants chronically underreported the number

of hours worked by these Plaintiffs. The hours and earning statements Defendants provided to

Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia were based on the same inaccurate data as contained in the payroll records and similarly underreported the number of hours worked.

49.      For their 2018 work harvesting citrus fruit and blueberries in central Florida for Defendants, as described in Paragraph 42, Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia were paid on a piece-rate basis, as delineated in Defendants' clearance order filed as part of the temporary labor certification application described in Paragraph 21. These workers' weekly piece-rate earnings frequently totaled less than the Florida AEWR. At times, these piece-rate earnings were less than the amount due under the minimum hourly wage provisions of the FLSA, 29 U.S.C. § 206(a). On such occasions, Defendants were required to supplement these workers' piece-rate earnings so that they at least equaled these wage rates. 20 C.F.R. § 655.122(l)(2). These supplemental wages are commonly referred to as a "make up" wage or "build-up pay."

50.      Defendants failed to supplement the piece-rate earnings of Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia from their work harvesting citrus fruit and blueberries in central Florida so as to ensure that each of their weekly earnings equaled or exceeded the AEWR, as required by the contract and 20 C.F.R. § 655.122(l)(2). As a result, Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia were paid wages less than the applicable AEWR and, on occasion, the FLSA for their work harvesting citrus fruit or blueberries in central Florida for Defendants.

**Recruitment, Travel, and Arrival in Florida of Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores**

51.      Defendants recruited and hired Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, Noe Badillo-Flores, and other individuals in Mexico to fill the central Florida watermelon harvesting jobs described in Defendants' temporary labor certification application referenced in Paragraph 22.

52.     Plaintiff Fidencio Martinez-Gregorio undertook considerable economic, familial, and personal sacrifices, including borrowing many thousands of pesos, to be able to afford the expenses required to come to the United States to work for Defendants.

53.     After being recruited and hired by Defendants, Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores each traveled at his own expense from his home to Matamoros, Tamaulipas, Mexico, where he was interviewed at the U.S. Consulate and issued an H-2A visa. Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores entered the United States at Brownsville, Texas in early May 2018 and traveled at their own expense from Brownsville to Defendants' jobsite in central Florida. Upon their arrival in central Florida, Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores were employed harvesting watermelons as members of Defendants' agricultural labor crew pursuant to Defendants' temporary labor certification application described in Paragraph 22.

54.     Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores each incurred and paid a number of expenses in conjunction with obtaining H-2A visas and entering the United States to come to work in Florida for Defendants. These expenses included transportation from their respective home to Matamoros and from Matamoros to Defendants' jobsite, lodging expenses while in Matamoros awaiting the processing of their visa applications, a fee for assistance in completing their visa applications and related documents, and a $6.00 (U.S.) fee paid at the U.S./Mexico border for issuance of an arrival-departure document referred to as Form I-94. The Form I-94 was necessary for Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores to enter the United States and work for Defendants.

55.     The expenses incurred and paid by Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores as described in Paragraph 54 were incurred primarily for the benefit or convenience of Defendants within the meaning of the regulations implementing the FLSA, 29 C.F.R. § 531.3(d)(1).

## Central Florida Watermelon Harvesting Employment of
## Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores

56.     During May 2018, Defendants employed Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores harvesting watermelons in central Florida. These watermelons were harvested for and sold in interstate commerce. The temporary labor certification application for central Florida work described in Paragraph 22 and the accompanying clearance order served as the employment contract between Defendants and Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores with respect to their central Florida employment. 20 C.F.R. § 655.122(q).

57.     Defendants never reimbursed Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores for the expenses described in Paragraph 54. As a result, the wages of Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores for their respective first workweeks of employment with Defendants' watermelon crew in central Florida were less than the federal minimum wage rate, the Florida minimum wage rate, and the Florida AEWR.

58.     Although they worked for Defendants through the conclusion of the central Florida watermelon contract period, Defendants never reimbursed Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez Gregorio, and Noe Badillo-Flores for their inbound transportation and subsistence expenses as promised in their employment contracts and required by 20 C.F.R. § 655.122(h)(1).

59.     Defendants transported Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, Noe Badillo-Flores, and the other members of the central Florida watermelon harvesting crew between the jobsite and their living quarters each day in various vans and buses owned by Defendants. These same vehicles were used by Defendants to transport Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, Noe Badillo-Flores, and the other crewmembers to nearby stores to purchase foodstuffs and to laundromats to wash their clothes.

60.     At no time during the 2018 central Florida watermelon harvest did Defendants have in effect an insurance policy in the amounts prescribed by 29 C.F.R. § 500.121(b) or a liability bond meeting the requirements of 29 C.F.R. § 500.124 that insured either of them against liability for damage to persons or property arising from the operation of the vehicles described in Paragraph 59. Instead, Defendants sought to satisfy the vehicle insurance requirements of 20 C.F.R. § 655.122(h)(4) through a worker's compensation insurance policy issued to Harbor America Florida, a professional employer organization that Defendants hired to provide payroll and other services with respect to Defendants' employees.

61.     The worker's compensation policy maintained by Harbor America Florida and referenced in Paragraph 60 did not cover all travel provided by Defendants to Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, Noe Badillo-Flores, and the other crew members employed during the 2018 central Florida watermelon harvest. It did not cover travel during periods when the passengers were not actively engaged in harvesting activities, such as travel to stores and laundromats, or interstate trips between jobsites in different states.

62.     Defendants failed to maintain payroll records accurately recording all compensable hours worked by Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores in the central Florida watermelon harvest. Defendants chronically

- 19 -

underreported the number of hours worked by Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores. The hours and earning statements Defendants provided to these Plaintiffs were based on the same inaccurate data as contained in the payroll records and similarly underreported the number of hours worked.

63. For their work harvesting watermelons in central Florida for Defendants, as described in Paragraph 56, Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores were paid on a piece-rate basis, as delineated in Defendants' clearance order filed as part of the temporary labor certification application for central Florida watermelon workers described in Paragraph 22. These Plaintiffs' weekly piece-rate earnings frequently totaled less than the AEWR. At times, these piece-rate earnings were less than the amount due under the minimum hourly wage provisions of the FLSA, 29 U.S.C. § 206(a), and the Florida Minimum Wage Act. On such occasions, Defendants were required to supplement the piece-rate earnings of Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores so that they at least equaled these wage rates. 20 C.F.R. § 655.122(l)(2).

64. Defendants failed to supplement the piece-rate earnings of Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores from their work harvesting watermelons in central Florida so as to ensure that their respective weekly earnings equaled or exceeded the AEWR, as required by the contract and 20 C.F.R. § 655.122(l)(2). As a result, Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores were paid wages less than the applicable AEWR and, on occasion, the FLSA and Florida minimum wage for their work harvesting watermelons in central Florida for Defendants.

**North Florida Watermelon Harvesting Employment of Diego Cruz-Cruz,
Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio,
and Noe Badillo-Flores**

- 20 -

65.     In late May 2018, and in anticipation of filling their labor needs for the north Florida watermelon harvest, Defendants petitioned USCIS to extend until June 25 the stays of a number of the members of their citrus and blueberry crews, including Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia. This petition was ultimately approved.

66.     On or about June 1, 2018, Defendants transported a number of the members of their central Florida workforce to north Florida to begin work in the watermelon harvest in north Florida. Among these workers were Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores.

67.     During June 2018, Defendants employed Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores harvesting watermelons in north Florida. These watermelons were harvested for and sold in interstate commerce. The temporary labor certification application for north Florida work described in Paragraph 22 and the accompanying clearance order served as the employment contract between Defendants and Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores with respect to their north Florida watermelon harvesting employment. 20 C.F.R. § 655.122(q).

68.     Defendants transported Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, Noe Badillo-Flores, and the other members of their north Florida watermelon harvesting crew between the jobsite and their living quarters each day in various vans and buses owned by Defendants. These same vehicles were used by Defendants to transport Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, Noe Badillo-Flores, and the other crewmembers to nearby stores to purchase foodstuffs and to laundromats to wash their clothes.

69.     At no time during the 2018 north Florida watermelon harvest did Defendants have in effect an insurance policy in the amounts prescribed by 29 C.F.R. § 500.121(b) or a liability bond meeting the requirements of 29 C.F.R. § 500.124 that insured either of them against liability for damage to persons or property arising from the operation of the vehicles described in Paragraph 68. Instead, Defendants sought to satisfy the vehicle insurance requirements of 20 C.F.R. § 655.122(h)(4) through a worker's compensation insurance policy issued to Harbor America Florida, a professional employer organization that Defendants hired to provide payroll and other services with respect to Defendants' employees.

70.     The worker's compensation policy maintained by Harbor America Florida and referenced in Paragraph 69 did not cover all travel provided by Defendants to Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, Noe Badillo-Flores, and the other crew members employed during the 2018 north Florida watermelon harvest. It did not cover travel during periods when the passengers were not actively engaged in harvesting activities, such as travel to stores and laundromats, or interstate trips between jobsites in different states.

71.     Defendants failed to maintain payroll records accurately recording all compensable hours worked by Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores in the north Florida watermelon harvest. Defendants chronically underreported the number of hours worked by Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores. The hours and earning statements Defendants provided to these Plaintiffs were based on the same inaccurate data as contained in the payroll records and similarly underreported the number of hours worked.

72.     For their work harvesting watermelons in north Florida for Defendants, as described in Paragraph 67, Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores were paid on a piece-rate basis, as delineated in Defendants' clearance order filed as part of the temporary labor certification application for north Florida watermelon workers described in Paragraph 22. These Plaintiffs' weekly piece-rate earnings frequently totaled less than the AEWR. At times, these piece-rate earnings were less than the amount due under the minimum hourly wage provisions of the FLSA, 29 U.S.C. § 206(a), and the Florida Minimum Wage Act. On such occasions, Defendants were required to supplement the piece-rate earnings of Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores so that they at least equaled these wage rates. 20 C.F.R. § 655.122(l)(2).

73.     Defendants failed to supplement the piece-rate earnings of Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores from their work harvesting watermelons in north Florida so as to ensure that their respective weekly earnings equaled or exceeded the AEWR, as required by the contract and 20 C.F.R. § 655.122(l)(2). As a result, Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores were paid wages less than the applicable AEWR and, on occasion, the FLSA and Florida minimum wage for their work harvesting watermelons in north Florida for Defendants.

**The Farmworkers' Recruitment, Travel, and Arrival in Missouri**

74.     To meet the manpower requirements for their Missouri jobs described in the temporary labor certification applications referenced in Paragraph 23 and the accompanying

- 23 -

clearance orders (Exhibits A and B), Defendants recruited and hired workers both from their Florida watermelon-harvesting operations and directly from Mexico.

75.    As the north Florida watermelon harvest was finishing, in or about the end of June 2018, Defendants recruited and hired Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores to work with their crew in the southeastern Missouri watermelon harvest under the job terms set out in Defendants' temporary labor certification applications referenced in Paragraph 23 and accompanying clearance orders relating to that work (Exhibits A and B). Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores accepted Defendants' job offer, after which time Defendants transported these Plaintiffs from north Florida to Kennett, Missouri. Upon arrival in southeastern Missouri, Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores were employed harvesting and packing watermelons as part of Defendants' agricultural labor crew pursuant to Defendants' temporary labor certification applications described in Paragraph 23. These watermelons were harvested for and sold in interstate commerce.

76.    Defendants recruited Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez and other individuals in Mexico to fill the Missouri watermelon harvesting and packing jobs described in the temporary labor certification applications referenced in Paragraph 23 and the accompanying

clearance orders (Exhibits A and B). For Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Morales-Tellez,  Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez, this was the first time they had ever come to the United States on an H-2A visa.

77.     As a condition for being selected to receive H-2As visas for the watermelon harvesting and packing jobs described in their temporary labor certification applications referenced in Paragraph 23, Defendants required Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez,  Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifaco Villegas-Cerecedo, and Eduardo Yañez-Yañez to each pay a recruitment fee to Defendants' agents in Mexico, in violation of 20 C.F.R. § 655.135(j).

78.     Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, and Bernardo Santiago-Zaragoza, undertook considerable economic, familial, and personal sacrifices, including borrowing many thousands of pesos, to be able to afford the expenses required to come to the United States to work for Defendants.

79.     After being recruited by Defendants, Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel

Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez,  Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez traveled at their own expense from their respective hometowns in Mexico to Matamoros, Tamaulipas, Mexico, where they were interviewed at the U.S. Consulate and issued H-2A visas.

80.     Plaintiffs Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez,  Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez entered the United States at Brownsville, Texas on June 28, 2018, at which point they traveled at their own expense from Brownsville to Kennett, Missouri.

81.     Plaintiff Luis Gerardo Alvarez-Alonso entered the United States at Brownsville, Texas on July 6, 2018 and traveled at his own expense from Brownsville to Kennett, Missouri.

82.     Upon their arrival in southeastern Missouri, the Farmworkers were employed harvesting watermelons as part of Defendants' agricultural labor crew pursuant to Defendants' temporary labor certification applications described in Paragraph 23. These watermelons were harvested for and sold in interstate commerce.

83.     In addition to the recruitment fees described in Paragraph 77, Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez,  Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez incurred and paid additional expenses in conjunction with obtaining

H-2A visas and entering the United States to come to work in Missouri for Defendants. These expenses included transportation from their hometowns in Mexico to Matamoros and from Matamoros to Missouri, lodging expenses while in Matamoros awaiting the processing of their visa applications, fees for assistance with completing their visa applications and related documents, and a $6.00 (U.S.) fee paid by each of them at the U.S./Mexico border for the issuance of an I-94 arrival-departure document.

84.     The expenses incurred and paid by Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez as described in Paragraphs 77 and 83 were incurred primarily for the benefit or convenience of Defendants within the meaning of the regulations implementing the FLSA, 29 C.F.R. §531.3(d)(1).

85.     Defendants failed to reimburse Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Eduardo Rodriguez-Cruz, Eduardo Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez for their pre-employment visa, transportation and lodging expenses, including those described in Paragraphs 77 and 83. Although they issued checks purportedly intended to reimburse these workers for a portion of the pre-employment expenses, including those described in Paragraphs 77 and 83, Defendants demanded that these Plaintiffs to immediately return or kick back these

funds, which most of them did. As a result, the wages of these Plaintiffs for their respective first workweeks of employment with Defendants' crew in Missouri were less than the FLSA mínimum wage, the Missouri mínimum wage, and the applicable AEWR.

86.     Although they each completed 50 percent of their respective employment contracts, Defendants never reimbursed Plaintiffs Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez for their inbound transportation and subsistence expenses, as promised in these individuals' employment contracts and required by 20 C.F.R. §655.122(h)(1).

### The Farmworkers' Housing in Missouri

87.     Upon their arrival in Missouri, the Farmworkers were assigned by Defendants to housing facilities in Kennett or Senath, Missouri.

88.     Defendants housed a number of crewmembers at the Budget Inn, 215 East South Bypass Avenue, Kennett. Defendants never disclosed to the DOL as part of their temporary labor certification applications that they would be housing H-2A workers at the Budget Inn.

89.     Among the workers housed at the Budget Inn were Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Leobardo Gonzalez-Olvera, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez.

90.     The accommodations at the Budget Inn were cramped, with many instances of

four or more workers sharing a room. For example, because of the large number of occupants in each room, crew members often slept two to a bed, with other roommates forced to sleep on the floor due to the lack of beds.

91.     Because of overcrowding in their rooms at the Budget Inn, Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, and Bernardo Santiago-Zaragoza developed a nightly sleeping rotation for the duration of their stay in which they shared a bed with a coworker one night and slept on the floor the following night for the duration of their stay. On occasion, overcrowding forced Plaintiffs Luis Alvarez-Alonso and Miguel Angel Cerecedo-Rodriguez to sleep on the tile bathroom floor.

92.     The rooms at the Budget Inn occupied by Plaintiffs Luis Gerardo Alvarez-Alonso, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Miguel Angel Morales-Tellez were infested by bedbugs.

93.     Defendants also housed some members of their agricultural labor crew at a wood frame house located at 9348 State Highway C, Unit #16, Senath, Missouri. The wood frame house was owned by Defendant Jorge J. Marin.

94.     Among the occupants of the wood frame house were Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, and Fidencio Martinez-Gregorio. The accommodations at the wood frame house failed to meet either the Occupational Safety and Health Administration ("OSHA") temporary labor camp standards set out at 29 C.F.R. § 1910.142 or the ETA migrant labor camp standards set out at 20 C.F.R §§ 654.404 *et seq.* Among other things, during the period that they resided at the wood frame house, Plaintiffs

Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, and Fidencio Martinez-Gregorio were each allotted less than 50 square feet of living space. In addition, the facility was structurally unsound, doors and windows were missing screens, no laundry facilities were provided, the refrigerator malfunctioned, and garbage was allowed to accumulate.

95.     During a portion of the 2018 watermelon harvest, Plaintiffs Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Miguel Angel Cerecedo-Rodriguez, Gustavo Cortez-Romero, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Eduardo Rodriguez-Cruz, Casimiro Rodriguez-Escobar, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez and a substantial portion of the remainder of Defendants' agricultural labor crew were housed at 200 Slicer Street in Kennett. The facility at that location was the former Dunklin County jail and was purchased by Defendants in or about April 2018.

96.     The accommodations at the former jail failed to meet either the OSHA temporary labor camp standards set out at 29 C.F.R. § 1910.142 or the ETA migrant labor camp standards set out at 20 C.F.R §§ 654.404 *et seq.* Among other things, the accommodations at the 200 Slicer Street site lacked adequate provisions for storage of personal items, had insufficient access to external light, lacked functional bathroom lights, had leaking sinks, had a non-usable kitchen, and lacked beds for each occupant.

97.     After an investigation by the DOL's Wage and Hour Division in July 2018 and the issuance of a preliminary injunction by the U.S. District Court for the Eastern District of Missouri on August 6, 2018, Defendants relocated members of their crew, including those workers who had been previously residing at the 200 Slicer Street facility and some workers who had been housed in the Budget Inn, to the 84 West Motel in Kennett.

98.     The facilities at the Budget Inn, the former jail at 200 Slicer Street, and the 84 West Motel all lacked cooking and kitchen facilities. Defendants arranged for meals to be catered to the Farmworkers and other members of the crew residing in these facilities. The charge for these meals was in excess of $12.26 per day. Although the clearance order promised that they would be provided three meals daily, the Farmworkers frequently were not provided with breakfast. Because the meal charges were higher than promised in their contracts, a number of the Farmworkers went into debt to one of Defendants' caterers.

99.     Defendant Jorge J. Marin and his relatives and supervisors lived in the Budget Inn, the wood frame house located at 9348 State Highway C, the former jail, and the 84 West Motel with the Farmworkers. The Farmworkers felt monitored and physically isolated by Defendants.

## The Farmworkers' Employment with Defendants in Missouri

100.     Defendants employed the Farmworkers harvesting, loading, transporting, grading, and packing watermelons in southeastern Missouri at various points in June, July, and August 2018. These watermelons were harvested for and sold in interstate commerce. The temporary labor certification applications described in Paragraph 23 and the accompanying clearance orders served as the employment contract between Defendants and the Farmworkers with respect to the Missouri employment. 20 C.F.R. § 655.122(q).

101.     The Farmworkers were employed packing and loading watermelons, including at the packing facilities operated by Jones & Jones Enterprises, Inc. and/or Elite Farm & Produce, LLC. These watermelons were sold in interstate commerce.

102.     Defendants transported the Farmworkers and the other members of their Missouri watermelon crew between the jobsite and their living quarters each day in various vans and buses

owned by Defendants. These same vehicles were used by Defendants to transport the Farmworkers and the other crewmembers to nearby stores to purchase foodstuffs, to banks to cash their checks, and to laundries to wash their clothes.

103.    Because the Farmworkers were housed and employed in a rural part of southeastern Missouri with little public transportation, they were almost entirely dependent on Defendants for vehicular transportation. The Farmworkers had no easy way to leave their worksites and housing other than on foot. One of Defendants' supervisors told Plaintiff Leobardo Gonzalez-Olvera not to leave the housing because the police or immigration might detain him.

104.    Because Defendants failed to timely reimburse the Farmworkers for their inbound recruitment, visa, and travel expenses, and because Defendants did not pay the Farmworkers for their Missouri work until after more than two weeks of employment there, many of the Farmworkers took out small loans from members of the Marin family to cover their living expenses.

105.    At no time during the 2018 Missouri watermelon harvest did Defendants have in effect a liability bond meeting the requirements of 29 C.F.R. § 500.124 that insured either of them against liability for damage to persons or property arising from the operation of the vehicles described in Paragraph 102.

106.    Defendants sought to satisfy the vehicle insurance requirements of 20 C.F.R. § 655.122(h)(4) through a worker's compensation insurance policy issued to Harbor America Central, a professional employer organization that Defendants hired to provide payroll and other services with respect to Defendants' employees.

107.    The worker's compensation policy maintained by Harbor America Central and referenced in Paragraph 106 did not cover all travel provided by Defendants to the Farmworkers

and the other crew members. Among other things, the policy did not cover travel during periods when the passengers were not actively engaged in harvesting activities, such as travel to stores, banks, and laundromats.

108.    The Farmworkers toiled for long hours under the hot summer sun with little shade and few breaks. The heat index often reached between 105 and 115 degrees. Defendants failed to provide potable drinking water and toilet and handwashing facilities as required by law, 29 C.F.R. § 1928.110, in the southeastern Missouri fields in which the Farmworkers performed hand-labor cutting, harvesting, loading, and transporting watermelons. Frequently, no toilet and handwashing facilities whatsoever were provided. While drinking water was provided on occasion, Defendants monitored the Farmworkers' water consumption, and Defendants failed to provide single-use drinking cups or fountains to dispense the water. As a result, the Farmworkers were forced to drink directly from the communal water jug or share a twelve-ounce Gatorade bottle as a drinking vessel.

109.    For their work cutting, harvesting, transporting, loading, grading, and packing watermelons in southeastern Missouri for Defendants, as described in Paragraphs 100 and 101, the Farmworkers and the other H-2A workers were paid only sporadically, and the sums tendered them constituted only a fraction of the wages they had earned. The workers' employment contracts provided that they were to be paid on a piece-rate basis for their labor. On those occasions when Defendants paid piece-rate wages to the Farmworkers and the other H-2A workers, the payments were at piece rates lower than those set out in the employment contracts.

110.    The piece-rate earnings of the Farmworkers and the other H-2A workers in the crew frequently totaled less than the $13.42 hourly AEWR for Missouri. At times, these piece-rate earnings were less than the amount due under the minimum hourly wage provisions of the

FLSA, 29 U.S.C. § 206(a), and the Missouri minimum wage law. On such occasions, Defendants were required to supplement the workers' individual piece-rate earnings so that they at least equaled the mandatory wage rates. 29 C.F.R. § 776.5; 20 C.F.R. § 655.122(l)(2). Defendants failed to supplement the individual weekly earnings of the Farmworkers and other H-2A workers so as to ensure that that these weekly earnings equaled or exceeded the applicable AEWR, as required by the employment contract and 20 C.F.R. § 655.122(l)(2). As a result, the Farmworkers and the other H-2A workers in the crew were paid wages less than the applicable AEWR and, on occasion, less than the FLSA minimum wage and the Missouri minimum wage for their work.

111.    Each workweek during the 2018 southeastern Missouri watermelon harvest, a portion of the employment of the Farmworkers and the other H-2A workers involved grading and packing watermelons in packinghouses, including the facilities described in Paragraph 101. Because these packinghouses handled produce other than that produce on their own respective operations, the packinghouse work of the Farmworkers and the other H-2A workers was subject to the FLSA's overtime provision, 29 U.S.C. § 207. Despite this fact, Defendants failed to pay the Farmworkers and the other H-2A workers at a rate not less than one and one-half times their regular rate for those workweeks in which their employment included packinghouse work and in which they were employed in excess of 40 hours.

112.    Defendants failed to maintain payroll records accurately recording the compensable hours worked by the Farmworkers in the southeastern Missouri watermelon harvest, in violation of 20 C.F.R. § 655.122(j). Among other things, Defendants chronically underreported the number of hours worked by the Farmworkers. The hours and earning statements Defendants provided to the Farmworkers were based on the same inaccurate data as

contained in the payroll records and similarly underreported the number of hours worked.

113.    Once it became apparent that the employment and housing conditions were substantially less than promised in their employment contracts, the Farmworkers and other H-2A workers in the crew began voicing complaints to Defendants and their foremen. In response, Defendants utilized force and threats of force to intimidate the Farmworkers and their co-workers into continuing to work.

114.    Defendants and their foremen routinely used forceful language—including expletives, threats, and invective—in order to drive the Farmworkers to work faster, to acquiesce in the illegal working conditions, and to dissuade them from leaving the job or formally complaining to governmental authorities. Among other things:

- Plaintiff Eduardo Rodriguez-Cruz was informed by both Jorge Marin-Perez, the father of Defendant Jorge J. Marin and a foreman with Defendants' 2018 Missouri crew, and Roberto Marin, the brother of Defendant Jorge J. Marin and a foreman with Defendants' 2018 Missouri crew, that if Plaintiff Eduardo Rodriguez-Cruz failed to complete the work contract, regardless of the wages and living conditions, he would be reported to immigration officials and forever barred from re-entering the United States. Plaintiff Oscar Merida-Godinez similarly heard Roberto Marin warn another worker that if he didn't work hard he would be reported to immigration;

- In an effort to intimidate the members of his work crew, including Plaintiffs Casimiro Rodriguez-Escobar and Miguel Angel Cerecedo-Rodriguez, from prematurely leaving the job, despite the poor wages and living conditions, Jorge Marin-Perez publicly threatened an H-2A worker seeking to depart from the

crew that if he persisted in his efforts, immigration officials would be notified and the worker would be deported. Plaintiff Sabino Campuzano-Dominga heard Defendant Jorge J. Marin make similar threats of deportation to co-workers;

- When a member of Plaintiff Eduardo Rodriguez-Cruz's work crew sought to leave Defendants' employ because of the wages and working conditions, Roberto Marin publicly announced that Defendants were going to make the departing worker "pay" through contacts they had in the area of the departing worker's residence in Mexico;

- Roberto Marin informed Plaintiff Sabino Campuzano-Dominga that there would be "negative consequences" if he left the job before the end of the contract; Roberto Marin further added that the only way to depart the job prematurely while avoiding "negative consequences" would be to make a $7,000 payment to Defendants;

- On August 5, 2018, Plaintiff Gustavo Cortez-Romero decided to surreptitiously leave Defendants' crew because of the poor wages and substandard housing. Within hours of leaving his assigned housing, he was telephoned by the agent of Defendants who had originally recruited him in Mexico and to whom Plaintiff Gustavo Cortez-Romero had paid a recruiting fee. The recruiter informed him that if he failed to return to the crew, Defendants would take action against his wife and daughter in Mexico;

- After Plaintiff Leobardo Gonzalez-Olvera, a friend and neighbor of Plaintiff Adan Castro-Guerrero, escaped from the job, Roberto Marin demanded that Plaintiff Adan Castro-Guerrero tell him where Plaintiff Leobardo Gonzalez-

Olvera had gone, told him to watch out, and warned him that had people in Mexico, which Plaintiff Adan Castro-Guerrero understood to be a threat. Plaintiffs Diego Cruz-Cruz and Quirino Eugenio-Lugo heard of similar efforts by Defendants and their supervisors to track down H-2A workers who had escaped;

- Jorge Marin-Perez cursed at Plaintiff Gustavo Cortez-Romero, telling him to "Get your ass up, or you're heading back to Mexico." The Marins made similar threats to Plaintiffs Leobardo Gonzalez-Olvera, Sabino Campuzano-Dominga, Roman Campuzano-Solano, Adan Castro-Guerrero, Casimiro Rodriguez-Escobar, Diego Cruz-Cruz, Alfredo Lugo-Garcia, Bernardo Santiago-Zaragoza, and Eduardo Yañez-Yañez; and

- When Plaintiff Miguel Angel Cerecedo-Rodriguez struggled to breathe in one of the packinghouses due to an asthma attack, Jorge Marin-Perez laughed at him and told him, "If you can't work, you're going back to Mexico!"

115.    In mid-July of 2018, investigators from the DOL's Wage and Hour Division commenced an investigation of Marin J's activities. Defendants threatened adverse immigration consequences and violence if the Farmworkers revealed to the DOL investigators Defendants' unlawful activities, including their forced labor scheme and collection of recruitment fees from the Farmworkers and other crew members. Among other things:

- Roberto Marin informed Plaintiff Casimiro Rodriguez-Escobar that Defendants knew who had contacted the DOL about the multitude of problems, thus prompting the agency's investigation, insinuating that he believed Plaintiff Casimiro Rodriguez-Escobar to be the whistleblower. Roberto Marin threatened

him that, upon his return to Mexico, Defendants would make him "pay" for
contacting the DOL;

- Shortly after the DOL investigation began, Roberto Marin telephoned Plaintiff
Fidencio Martinez-Gregorio's cousin in Mexico. Roberto Marin told Plaintiff
Fidencio Martinez-Gregorio's cousin that Defendants suspected Plaintiff Fidencio
Martinez-Gregorio had truthfully responded to the DOL investigators' questions,
thereby revealing some of Defendants' unlawful activities. Roberto Marin stated
to Plaintiff Fidencio Martinez-Gregorio's cousin that, as a result, Defendants were
considering sending one of their contacts in Mexico to "do something" to Plaintiff
Fidencio Martinez-Gregorio or his family;

- Foreman Gustavo Olguin-Lopez told Plaintiff Gustavo Cortez-Romero that unless
he lied to the DOL investigators regarding about the substandard wages, working
conditions, and housing, he would be repatriated to Mexico and prevented from
ever again returning to the United States on a guestworker contract. Holguin
added that Defendants knew where Plaintiff Gustavo Cortez-Romero's family
resided in Mexico and that Defendants had sufficient connections with criminal
elements there that they could order the family's execution if Plaintiff Gustavo
Cortez-Romero responded truthfully to the DOL investigator's inquiries;

- Jorge Marin-Perez and Gustavo Olguin-Lopez instructed Plaintiffs Eduardo
Rodriguez-Cruz, Sabino Campuzano-Dominga, Miguel Angel Cerecedo-
Rodriguez, Luis Gerardo Alvarez Alonso, and Bernardo Santiago-Zaragoza to lie
to the DOL investigators regarding the payment of recruitment fees and the wages
being paid in Missouri on the threat of being barred from future employment in

the United States; and

- Several months after the 2018 southeastern Missouri watermelon harvest ended, Defendant Jorge J. Marin came to Plaintiff Luis Gerardo Alvarez-Alonso's community on at least two occasions in an attempt to locate him. This made Plaintiff Luis Gerardo Alvarez-Alonso fearful for his own safety and that of his family. Plaintiff Luis Gerardo Alvarez-Alonso believed that Jorge J. Marin was seeking to extort him for money and to induce him to cease cooperating with DOL officials investigating Marin.

116.    The kinds of threats, invective, and expletives set out in Paragraphs 114 and 115 were common knowledge among the H-2A workers, including the Farmworkers, while employed by Defendants. In addition to being subjected themselves to this conduct, the Farmworkers overheard these kinds of threats and verbal abuse directed to others and discussed the matter among themselves and with other H-2A workers.

117.    The Farmworkers' southeastern Missouri employment with Defendants' crew ended in August 2018, well before the October 20, 2018 end date set out in their employment contracts. As a result, the Farmworkers were not offered employment for at least three-fourths of the workdays covered by the contracts. Plaintiffs Sabino Campuzano-Dominga, Roman Campuzano-Solano, Diego Cruz-Cruz, Alfredo Lugo-Garcia, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez worked for Defendants through the conclusion of the 2018 southeastern Missouri watermelon harvest, on or about August 22, 2018. Nevertheless, Defendants failed to pay them the amount due under the three-quarters guarantee contained in their employment contracts and as set out at 20 C.F.R. § 655.122(i).

118.    Defendants failed to reimburse Plaintiffs Sabino Campuzano-Dominga, Roman Campuzano-Solano, Diego Cruz-Cruz, Alfredo Lugo-Garcia, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez for the full amount of the travel and subsistence expenses they incurred traveling from Missouri back to their respective homes in Mexico following the conclusion of the 2018 Missouri watermelon harvest, as required by these workers' employment contracts and 20 C.F.R. § 655.122(h)(2).

119.    As a result of Defendants' actions as described in Paragraph 118, Plaintiffs Sabino Campuzano-Dominga, Roman Campuzano-Solano, Diego Cruz-Cruz, Alfredo Lugo-Garcia, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez were paid less than the applicable AEWR, the Missouri minimum wage, and the FLSA minimum wage for their final week of employment with Defendants.

### North Carolina Employment of
### Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio

120.    As the southeastern Missouri watermelon harvest was finishing, in or about the end of August 2018, Defendants recruited and hired Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio to work with their crew in the North Carolina apple and hemp harvest under the job terms set out in Defendants' temporary labor certification application relating to that work.

121.    Defendants transported Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio from Missouri to Hendersonville, North Carolina, in a vehicle owned by Defendants. Upon their arrival in western North Carolina, Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio were employed harvesting apples and hemp as part of Defendants'

agricultural labor crew pursuant to their temporary labor certification application described in Paragraph 24.

122.    Defendants employed Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio harvesting apples and hemp in western North Carolina during September and October 2018. These products were harvested for and sold in interstate commerce. The temporary labor certification application described in Paragraph 24 and the accompanying clearance order served as the employment contract between Defendants and Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio with respect to their North Carolina employment. 20 C.F.R. § 655.122(q).

123.    Defendants transported Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio between the jobsite and their living quarters each day in various vans and buses owned by Defendants. These same vehicles were used by Defendants to transport Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and the other crewmembers from Missouri to North Carolina to begin work, to nearby stores to purchase foodstuffs, and to laundries to wash their clothes.

124.    At no time during the 2018 North Carolina apple and hemp harvest did Defendants have in effect a liability bond meeting the requirements of 29 C.F.R. § 500.124 that insured either of them against liability for damage to persons or property arising from the operation of the vehicles described in Paragraph 123. Instead, Defendants sought to satisfy the vehicle insurance requirements through a worker's compensation insurance policy issued to Harbor America Central.

125.    The worker's compensation policy maintained by Harbor America Central and referenced in Paragraph 124 did not cover all travel provided by Defendants to Plaintiffs Quirino

Eugenio-Lugo, Fidencio Martinez-Gregorio, and the other crewmembers during the North Carolina apple harvest. It did not cover travel during periods when the passengers were not actively engaged in harvesting activities, such as travel to stores and laundromats, or trips between jobsites in different states.

126.    Defendants failed to maintain payroll records accurately recording the compensable hours worked by Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio during the 2018 North Carolina apple and hemp harvest. Defendants routinely underreported the number of hours worked by Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio. The hours and earning statements Defendants provided to Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio were based on the same inaccurate data as contained in the payroll records and similarly underreported the number of hours worked.

127.    For much of his work harvesting apples in North Carolina for Defendants, as described in Paragraph 122, Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio were paid on a piece-rate basis. Their weekly piece-rate earnings frequently totaled less than the AEWR. At times, these piece-rate earnings were less than the amount due under the minimum hourly wage provisions of the FLSA, 29 U.S.C. § 206(a), and the North Carolina Wage and Hour Act. On such occasions, Defendants were required to supplement the piece-rate earnings of Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio so that they at least equaled these wage rates. 29 C.F.R. § 776.5 and 20 C.F.R. § 655.122(l)(2).

128.    Defendants failed to supplement the piece-rate earnings of Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio from their work harvesting apples and hemp in North Carolina so as to ensure that their weekly earnings equaled or exceeded the AEWR, as required by the contract and 20 C.F.R. § 655.122(l)(2). As a result, Plaintiffs Quirino Eugenio-

Lugo and Fidencio Martinez-Gregorio was paid hourly wages less than the applicable AEWR of $11.46 and, on occasion, the FLSA and North Carolina minimum wages, for his work harvesting apples and hemp in North Carolina for Defendants.

129.    Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio worked for Defendants through the conclusion of the 2018 North Carolina apple and hemp harvest, on or about October 23, 2018. Defendants failed to reimburse Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio for the full cost of their travel and subsistence expenses incurred while traveling from North Carolina back to their respective homes in Mexico following the conclusion of the 2018 North Carolina apple and hemp harvest, as required by these Plaintiffs' employment contract and 20 C.F.R. § 655.122(h)(2).

130.    Because Defendants failed to reimburse them for the full cost of their return travel and subsistence expenses following the conclusion of the 2018 North Carolina apple and hemp harvest, Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio were paid less than the applicable AEWR and the FLSA and North Carolina minimum wages for their final week of employment with Defendants.

### Collective Action Allegations

131.    All Claims set forth in Count I are brought by the Farmworkers on behalf of themselves and all other similarly situated persons pursuant to 29 U.S.C. § 216(b). These similarly situated individuals consist of all H-2A temporary agricultural workers employed by Defendants during the 2018 southeast Missouri watermelon harvest.

132.    During the 2018 Missouri watermelon harvest from June through August 2018, Defendants employed in excess of 80 different persons, including the Farmworkers. Defendants failed to pay the Farmworkers and other similarly situated employees the FLSA minimum wage

of $7.25 per hour.

133.     As delineated in Count I, these violations of the FLSA's minimum wage provisions resulted from Defendants' failure to supplement the H-2A workers' piece-rate earnings so that their respective workweek earnings equaled or exceeded the minimum wage and from Defendants' failure to reimburse the H-2A workers during their first week of employment for pre-employment expenses incurred and facilities primarily benefitting the Defendants, and to reimburse the H-2A workers for the full cost of their return transportation costs to Mexico at the conclusion of the Missouri harvest.

134.     Defendants failed to pay the H-2A workers overtime wages as required by the FLSA for those workweeks they performed non-exempt packinghouse work and were employed in excess of 40 hours.

135.     Pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), the Farmworkers seek to prosecute their FLSA claims as a collective action on behalf of all H-2A temporary agricultural workers employed by Defendants during the 2018 southeast Missouri watermelon harvest. Notice of the pendency and any resolution of this action can be provided to the members of the class by mail, print publication, radio, internet publication, social media postings in H-2A Facebook groups, direct messages to individuals via Facebook Messenger, Instagram, and WhatsApp, and through nongovernmental organizations based in the employees' sending communities in Mexico.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
**(FAIR LABOR STANDARDS ACT)**

136.     This count sets forth a claim by the Farmworkers and similarly situated workers for Defendants' violations of the FLSA.

137.     Defendants violated the minimum wage provisions of the FLSA, 29 U.S.C. §
206(a), by failing to pay the Farmworkers and similarly situated workers at least $7.25 for every
compensable hour of labor performed in each workweek during which they were employed.

138.     The violations of the minimum wage provisions of the FLSA as set out in
Paragraph 137 resulted in part from Defendants' failure to reimburse the Farmworkers and
similarly situated workers during their first workweek of employment for expenses incurred
primarily for the benefit of Defendants.

139.     The violations of the minimum wage provisions of the FLSA as set out in
Paragraph 137 resulted in part from Defendants' failure to fully reimburse Plaintiffs Sabino
Campuzano-Dominga, Roman Campuzano-Solano, Diego Cruz-Cruz, Quirino Eugenio-Lugo,
Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, Oscar Merida-Godinez, Miguel Angel
Morales-Tellez, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-
Yañez during their final week of employment for their expenses in returning to their homes in
Mexico after concluding their employment with Defendants.

140.     The violations of the minimum wage provisions of the FLSA as set out in
Paragraph 137 resulted in part from Defendants' failure to credit the Farmworkers and similarly
situated workers with all compensable hours worked.

141.     Defendants violated the overtime provisions of the FLSA, 29 U.S.C. § 207, by
failing to pay the Farmworkers and similarly situated workers at a rate not less than one and one-
half times their regular rate for those workweeks during the 2018 southeastern Missouri
watermelon harvest in which the Farmworkers and similarly situated workers performed non-
exempt work packing watermelons and worked in excess of 40 hours.

142.     As a consequence of Defendants' violations of the minimum wage provisions of

the FLSA as set forth in this count, each Farmworker and similarly situated worker is entitled to recover the amount of his unpaid minimum wages, an equal amount in liquidated damages, and attorney's fees pursuant to 29 U.S.C. § 216(b).

143.    As a consequence of Defendants' violations of the overtime provisions of the FLSA as set forth in this count, each Farmworker and similarly situated worker is entitled to recover the amount of his unpaid overtime wages, an equal amount in liquidated damages, and attorney's fees pursuant to 29 U.S.C. § 216(b).

<strong>COUNT II<br>(BREACH OF CONTRACT)</strong>

144.    This count sets forth a claim for damages by the Farmworkers for Defendants' breach of its employment contracts with the Farmworkers, as embodied in the clearance orders described in Paragraphs 21, 22, 23, and 24.

145.    With respect to the 2018 central Florida citrus and blueberry harvests, Defendants breached their employment contracts with Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia by providing terms and conditions of employment that were materially different from those promised in the citrus and blueberry clearance order described in Paragraph 21, including the following:

  a.    Failing to reimburse Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia for the costs they incurred for inbound transportation between their respective homes in Mexico and the central Florida jobsite and their subsistence en route;

  b.    Transporting Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia in vehicles that lacked insurance at least equal to that required under the AWPA, 29 U.S.C. § 1841 and 29 C.F.R. § 500.105 and 29 C.F.R. §§ 500.120 to 500.128;

     c.     Failing to pay Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia wages at least equal to the AEWR for their labor during the central Florida citrus and blueberry harvests;

     d.     Failing to keep and maintain accurate payroll records regarding the employment of Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia during the 2018 central Florida citrus and blueberry harvests; and

     e.     Failing to provide Plaintiffs Diego Cruz-Cruz and Alfredo Lugo-Garcia with earning statements accurately reporting their respective hours worked.

147.    With respect to the 2018 central Florida watermelon harvest, Defendants breached their employment contracts with Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores by providing terms and conditions of employment that were materially different from those promised in the central Florida watermelon clearance order described in Paragraph 22, including the following:

     a.     Failing to reimburse Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores for the costs each of them incurred for inbound transportation between their homes in Mexico and the central Florida jobsite and their subsistence en route;

     b.     Transporting Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores in vehicles that lacked insurance at least equal to that required under the AWPA, 29 U.S.C. § 1841 and 29 C.F.R. § 500.105 and 29 C.F.R. §§ 500.120 to 500.128;

        c.      Failing to pay Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores wages at least equal to the AEWR for their labor during the 2018 central Florida watermelon harvest;

        d.      Failing to keep and maintain accurate payroll records regarding the employment of Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores during the 2018 central Florida watermelon harvest; and

        e.      Failing to provide Plaintiffs Quirino Eugenio-Lugo, Fidencio Martinez-Gregorio, and Noe Badillo-Flores with earning statements accurately reporting their hours worked.

148.    With respect to the 2018 north Florida watermelon harvest, Defendants breached their employment contracts with Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores by providing terms and conditions of employment that were materially different from those promised in the north Florida watermelon clearance order described in Paragraph 22, including the following:

        a.      Transporting Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores in vehicles that lacked insurance at least equal to that required under the AWPA, 29 U.S.C. § 1841 and 29 C.F.R. § 500.105 and 29 C.F.R. §§ 500.120 to 500.128;

        b.      Failing to pay Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores wages at least equal to the AEWR for their labor during the 2018 north Florida watermelon harvest;

        c.      Failing to keep and maintain accurate payroll records regarding the employment of Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo Garcia,

Fidencio Martinez-Gregorio, and Noe Badillo-Flores during the 2018 north Florida watermelon harvest; and

    d.    Failing to provide Plaintiffs Diego Cruz-Cruz, Quirino Eugenio-Lugo, Alfredo Lugo-Garcia, Fidencio Martinez-Gregorio, and Noe Badillo-Flores with earning statements accurately reporting their hours worked.

149.    With respect to the 2018 southeastern Missouri watermelon harvest, Defendants breached their employment contracts with the Farmworkers by providing terms and conditions of employment that were materially different from those promised in the clearance orders described in Paragraph 23 (Exhibits A and B), including the following:

    a.    Failing to contractually forbid their recruiters and agents from seeking or receiving payments or other compensation from the Farmworkers and other prospective H-2A workers;

    b.    Failing to reimburse the Farmworkers for the costs each of them incurred for inbound transportation between their respective homes in Mexico and the southeastern Missouri jobsite and their subsistence en route;

    c.    Failing to provide the Farmworkers housing at no charge that met applicable federal standards;

    d.    Failing to either furnish the Farmworkers with free and convenient cooking and kitchen facilities or provide them with three meals per day at a rate of no more than $12.26 per day;

    e.    Transporting the Farmworkers in vehicles that lacked insurance at least equal to that required under the AWPA, 29 U.S.C. § 1841 and 29 C.F.R. § 500.105 and 29 C.F.R. §§ 500.120 to 500.128;

f.      Failing to pay the Farmworkers wages at least equal to the AEWR for their labor during the 2018 southeastern Missouri watermelon harvest;

g.      Failing to provide the Farmworkers with working conditions that complied with all applicable federal, state, and local laws and regulations, including those relating to field sanitation;

h.      Failing to provide the Farmworkers with work opportunities or compensation due them under the three-quarters guarantee;

i.      Failing to keep and maintain accurate payroll records regarding the Farmworkers' employment during the 2018 southeastern Missouri watermelon harvest;

j.      Failing to provide the Farmworkers with earning statements accurately reporting their hours worked;

k.      Failing to fully reimburse Plaintiffs Sabino Campuzano-Dominga, Roman Campuzano-Solano, Diego Cruz-Cruz, Alfredo Lugo-Garcia, Oscar Merida-Godinez, Miguel Angel Morales-Tellez, Bernardo Santiago-Zaragoza, Bonifacio Villegas-Cerecedo, and Eduardo Yañez-Yañez for the costs each of them incurred for outbound transportation between southeastern Missouri and their respective homes in Mexico and their subsistence en route; and

l.      Directly or through their agents seeking or receiving payment from the Farmworkers for recruitment costs;

150.    With respect to the North Carolina apple and hemp harvest, Defendants breached their employment contracts with Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio by providing terms and conditions of employment that were materially different from those promised in the clearance order described in Paragraph 24, including the following:

a.      Transporting Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio in vehicles that lacked insurance at least equal to that required under the AWPA, 29 U.S.C. § 1841 and 29 C.F.R. § 500.105 and 29 C.F.R. §§ 500.120 to 500.128;

b.      Failing to pay Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio wages at least equal to the AEWR for their labor during the North Carolina apple and hemp harvest;

c.      Failing to keep and maintain accurate payroll records regarding the employment of Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio during the North Carolina apple and hemp harvest;

d.      Failing to provide Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio with earning statements accurately reporting their hours worked; and

e.      Failing to fully reimburse Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio for the costs they incurred for outbound transportation between North Carolina and their respective homes in Mexico and their subsistence en route.

151.    Defendants' breaches of its employment contract obligations as described in this Count have caused the Farmworkers substantial injuries for which they seek damages to the fullest extent allowed in law or equity.

## COUNT III
## (TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT)
### Forced Labor (18 U.S.C. § 1589)

152.    This count sets forth a claim by the Farmworkers for Defendants' violations of the TVPRA, 18 U.S.C. § 1589.

153.    Defendants knowingly obtained the labor of the Farmworkers by threats of force and serious harm to them or their families. These threats were intended to cause the Farmworkers

to believe that if they did not continue to work with Defendants' crew in the 2018 southeastern Missouri watermelon harvest, they or their families suffer serious harm.

154.    Defendants knowingly obtained the labor of the Farmworkers by threatening abuse of the law or legal process, including taking legal actions to bar them from obtaining future guestworker visas for employment in the United States. These threats were intended to cause the Farmworkers to believe that if they did not continue to work with Defendants' crew in the 2018 southeastern Missouri watermelon harvest, they would suffer serious harm, including the denial of future guestworker visas to work in the United States.

155.    Defendants knowingly benefitted financially from participation in a venture that engaged in forced labor. Among other things, Defendants financially benefited from their practices of employing the Farmworkers at substandard and unlawful wages and their collection of illegal recruitment fees and travel reimbursement kickbacks.

156.    As a proximate result of Defendants' violations of the TVPRA as set forth in this count, the Farmworkers have suffered injury and are entitled to recover compensatory damages including damages for emotional pain and suffering, punitive damages, and attorney's fees, expert fees, and costs as authorized by 18 U.S.C. § 1595(a).

### COUNT IV
### (TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT)
### Trafficking (18 U.S.C. § 1590)

157.    This count sets forth a claim by the Farmworkers for Defendants' violations of the TVPRA, 18 U.S.C. § 1590.

158.    18 U.S.C. § 1590 provides that "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter," including the laws prohibiting forced labor, has engaged in unlawful behavior under

the TVPRA.

159.    Defendants knowingly recruited, transported, provided, and obtained the Farmworkers for labor and services in violation of the laws prohibiting forced labor, as described in the Farmworkers' Third Count.

160.    As a proximate result of Defendants' violations of the TVPRA as set forth in this count, the Farmworkers have suffered injury and are entitled to recover compensatory damages including damages for emotional pain and suffering, punitive damages, and attorney's fees, expert fees, and costs as authorized by 18 U.S.C. § 1595(a).

## COUNT V
### (FLORIDA MINIMUM WAGE ACT)
**Section X, Article 24 of the Florida Constitution & Fla. Stat. § 448.110**

161.    This count sets forth a claim by Plaintiff Fidencio Martinez-Gregorio for Defendants' violations of the Florida Minimum Wage Act, Fla. Stat. § 448.110(6)(a), during the 2018 central and north Florida watermelon harvests.

162.    In 2018 Defendant Marin J was an employer of Plaintiff Fidencio Martinez-Gregorio, whom it employed as its employee, within the meaning of the Florida Wage and Hour Act, Fla. Stat. § 448.01, because it hired him, directed and supervised his daily work activities, assigned him his tasks on a daily basis, and paid him wages for his labor.

163.    Defendant Jorge J. Marin was an employer of Plaintiff Fidencio Martinez-Gregorio in 2018 within the meaning of the Florida Minimum Wage Act, Fla. Stat. § 448.110, because, among other things, he determined what tasks Plaintiff Fidencio Martinez-Gregorio would perform each day, supervised his performance of his assigned tasks, and paid him wages for his labor. As a joint employer, Defendant Jorge J. Marin was contractually bound, along with Marin J, to Plaintiff Fidencio Martinez-Gregorio by the terms of his employment contracts.

164.     Defendants paid Plaintiff Fidencio Martinez-Gregorio less wages than the wages to which he was entitled at the Florida Minimum Wage Act, as set out in Paragraphs 51 to 73.

165.     Plaintiff Fidencio Martinez-Gregorio has complied with the notice requirements of Fla. Stat. § 448.110(6)(a), notifying Defendants of the violations described in Paragraphs 51 to 73, and of Plaintiff Fidencio Martinez-Gregorio's intent to initiate this action. The notice to Defendants identified the minimum wages to which Plaintiff Fidencio Martinez-Gregorio was entitled, estimated work dates and hours for which payment was sought, and estimated the total amount of unpaid wages sought through the date of the notice. Defendants failed to pay the unpaid wages or otherwise resolve the claim within 15 days of their receipt of the letter.

166.     As a result of Defendants' failure to pay wages as described in Paragraphs 51 to 73, Plaintiff Fidencio Martinez-Gregorio is entitled to the full amount of his unpaid wages for his work during the 2018 central and north Florida watermelon harvests and an amount equal to twice the amount of unpaid wages as liquidated damages, as well as costs and attorney's fees.

## COUNT VI
## (MISSOURI WAGE PAYMENT LAW)
### Mo. Rev. Stat. § 290.527

167.     This count sets forth a claim by the Farmworkers for Defendants' violations of the Missouri wage payment law, Mo. Rev. Stat. § 290.527, during the 2018 southeastern Missouri watermelon harvest.

168.     By their actions described in Paragraphs 100 to 119, Defendants paid the Farmworkers wages less than the Missouri minimum wage for their employment during the 2018 southeastern Missouri watermelon harvest.

169.     Defendants failed to pay the Farmworkers overtime wages as required by law for their non-exempt work during the 2018 southeastern Missouri watermelon harvest.

170.     As a result of Defendants' failure to pay minimum and overtime wages as required by Missouri law, the Farmworkers are entitled to the full amount of these unpaid minimum and overtime wages and an amount equal to twice the unpaid wages as liquidated damages, as well as costs and attorney's fees.

### COUNT VII
### (NORTH CAROLINA WAGE AND HOUR ACT)
### N.C.G.S. § 95-25.6

171.     This count sets forth a claim by Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio for Defendants' violations of the North Carolina Wage and Hour Act, N.C.G.S. § 95-25.6, during the 2018 North Carolina apple and hemp harvest.

172.     In 2018 Defendant Marin J. was an employer of Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio, whom it employed as its employees, within the meaning of the North Carolina Wage and Hour Act, N.C.G.S. § 95-25.2(5), because it hired Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio, directed and supervised their daily work activities, assigned them their tasks on a daily basis, and paid them wages for their labor.

173.     Defendant Jorge J. Marin was an employer of Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio, whom he employed as his employees, in 2018 within the meaning of the North Carolina Wage and Hour Act N.C.G.S. § 95-25.2(5), because, among other things, he determined what tasks Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio would perform each day, supervised their performance of their assigned tasks, and paid them wages for their labor. As a joint employer, Defendant Jorge J. Marin was contractually bound, along with Defendant Marin J, to Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio by the terms of their employment contracts.

174.     By their actions described in Paragraphs 120 to 130, Defendants failed to pay Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio at least the applicable AEWR on their regular payday, as required by the North Carolina Wage and Hour Act.

175.     As a result of Defendants' failure to pay wages as described in Paragraphs 120 to 130, Plaintiffs Quirino Eugenio-Lugo and Fidenco Martinez-Gregorio are entitled to the full amount of their unpaid wages for their work during the 2018 North Carolina apple and hemp harvest and an amount equal to the amount of unpaid wages as liquidated damages, in accordance with N.C.G.S. § 95-25.22.

## PRAYER FOR RELIEF

WHEREFORE, the Farmworkers request that this Court enter an order:

a.     Allowing this action to proceed as a representative action pursuant to 29 U.S.C. § 216(b) for all H-2A workers employed by Defendants in Missouri during the 2018 watermelon harvest and whose wages were below the wages required to be paid by the FLSA;

b.     Ordering that notice of the lawsuit be issued in an effective manner to the members of the putative class described in Paragraph 135 so that similarly situated employees may promptly file consent forms and join this action;

c.     Declaring that Defendants, by the acts and omissions described above, violated the Farmworkers' rights under the FLSA, as set forth in Count I;

d.     Granting judgment in favor of the Farmworkers and against Defendants, jointly and severally, on their FLSA minimum wage claims set forth in Count I and awarding each of the Farmworkers his unpaid minimum wages and an equal amount in liquidated damages, and attorney's fees;

e.       Granting judgment in favor of those similarly situated who consent to join this action on their FLSA minimum wage claims set forth in Count I and awarding each worker the amount of his unpaid minimum wages, along with an equal amount as liquidated damages, and attorney's fees;

f.       Granting judgment in favor of Farmworkers and against Defendants, jointly and severally, on their FLSA overtime wage claims set forth in Count I and awarding each of these Farmworkers his unpaid overtime wages and an equal amount in liquidated damages, and attorney's fees;

g.       Granting judgment in favor of those similarly situated who consent to join this action on their FLSA overtime wage claims set forth in Count I and awarding each worker the amount of his unpaid overtime wages, along with an equal amount as liquidated damages, and attorney's fees;

h.       Granting judgment in favor of the Farmworkers and against Defendants, jointly and severally, on the breach of contract claims set forth in Count II, and awarding each of the Farmworkers his actual and compensatory damages;

i.       Granting judgment in favor of the Farmworkers and against Defendants, jointly and severally, on their TVPRA forced labor claim as set forth in Count III and awarding each of the Farmworkers damages, including compensatory and punitive damages, as well as costs and attorney's fees;

j.       Granting judgment in favor of the Farmworkers and against Defendants, jointly and severally, on their TVPRA forced labor claim as set forth in Count IV and awarding each of the Farmworkers damages, including compensatory and punitive damages, as well as costs and attorney's fees;

k.     Granting judgment in favor of Plaintiff Fidencio Martinez-Gregorio and against Defendants, jointly and severally, on his claims under the Florida Minimum Wage Act set forth in Count V and awarding Plaintiff Fidencio Martinez-Gregorio his unpaid wages and an amount equal to twice these unpaid wages as liquidated damages, as well as costs and attorney's fees;

l.     Granting judgment in favor of the Farmworkers and against Defendants, jointly and severally, on their claims under the Missouri wage payment law forth in Count VI and awarding each of the Farmworkers his unpaid minimum and overtime wages due under Missouri law, along with an amount equal to twice these unpaid wages as liquidated damages, as well as costs and attorney's fees;

m.     Granting judgment in favor of Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio and against Defendants, jointly and severally, on their claims under the North Carolina Wage and Hour Act set forth in Count VII and awarding Plaintiffs Quirino Eugenio-Lugo and Fidencio Martinez-Gregorio their unpaid wages and an amount equal to these unpaid wages as liquidated damages, as well as costs and attorney's fees;

n.     Awarding the Farmworkers their costs of this litigation; and

o.     Granting such other relief as this Court deems just and appropriate.

Respectfully submitted,

*/s/ Gregory S. Schell*
Gregory S. Schell
Florida Bar Number 287199
Southern Migrant Legal Services
A Project of Texas RioGrande Legal Aid, Inc.
311 Plus Park Boulevard, Suite 135
Nashville, Tennessee 37217
Telephone:     (615) 538-0725
Facsimile:     (615) 366-3349
Email: gschell@trla.org

Julie M. Larson

Missouri Bar Number 70500
Legal Aid of Western Missouri, Inc.
4001 Blue Parkway, Suite 300
Kansas City, Missouri 64130
Telephone:       (816) 474-1413
Facsimile:       (816) 474-9751
Email            jlarson@lawmo.org
*Appearing Pro Hac Vice*

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 30, 2020, a true and complete copy of the foregoing proposed second amended complaint was furnished by electronic mail to Defendants at Marin213@icloud.com, and by first class United States mail, postage prepaid, to the following:

        Jorge J. Marin
        2148 North Torrington Road
        Avon Park, Florida  33825

        Marin J Corp
        c/o Jorge J. Marin
        2148 North Torrington Road
        Avon Park, Florida  33825

        ***/s/ Gregory S. Schell***
        Gregory S. Schell

# EXHIBIT A



**U.S. Department Labor**
**Employment and Training Administration**

OMB Control No. 1205-0134
Expiration Date: March 31, 2019

**Agricultural and Food Processing Clearance Order ETA Form 790**
**Orden de Empleo para Obreros/Trabajadores Agricolas y Procesamiento de Alimentos**

**(Print or type in each field block – To include additional information, go to block # 28 – Please follow Step-By-Step Instructions)**
**(Favor de usar letra de molde en la solicitud – Para incluir información adicional vea el punto # 28 – Favor de seguir las instrucciones paso-a-paso)**

1. Employer's and/or Agent's Name and Address (Number, Street, City, State and Zip Code / Nombre y Dirección del Empleador/Patrón y/o Agente (Número, Calle, Ciudad, Estado y Código Postal ):

Marin J. Corp.
2148 N. Torrington Rd.
Avon Park, FL 33825

a) Federal Employer Identification Number (FEIN) / Número federal de Identificación del Empleador:

▬▬▬▬▬

b) Telephone Number / Número de Telefono:

(229) 456-1897

c) Fax Number / Número de Fax:

N/A

d) E-mail Address / Dirección de Correo Electrónico:

marincorp2015@outlook.com

2. Address and Directions to Work Site / Domicilio y Direcciones al lugar de trabajo:

Marin J. Corp. will be working in Dunklin County in the state of Missouri. The harvesting itinerary with address to work-site can be found in Attachment #2.

Marin J. Corp. trabajara en el condado de Dunklin en el estado de Missouri. El itinerario de cosecha con los domicilios de trabajo estan adjuntos en accesoroio #2.

3. Address and Directions to Housing / Domicilio y Direcciones al lugar de vivienda:

1. 200 Slicer St., Kennett, MO 63857

a) Description of Housing / Descripción de la vivienda:

1. Concrete building equiped with bedrooms, bathrooms, and kitchen facility
1. Edificio de concreto equipado con cuartos, baños, y cocina

*See Attachment #3 for Continuation and Spanish Translation
*Vea Acceso #3 para Continuacion y Traduccion en Español

**Nos. 4 through 8 for STATE USE ONLY**
**Números 4 a 8 para USO ESTATAL**

4. SOC (O*NET/OES) Occupational Code / Código Industrial:

45-2092

a. SOC (ONET/OES) Occupational Title / Título Ocupacional

Farmworker Laborer Crop

5. Job Order No. / Num. de Orden de Empleo:

12484859

6. Address of Order Holding Office (include Telephone number) / Dirección de la Oficina donde se radicó la oferta (incluya el número de teléfono):

Kennett Job Ctr
1100 S. By-Pass   63857

a. Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (Incluya el número de teléfono de su línea directa).

573-888-4518

7. Clearance Order Issue Date / Fecha de Emisión de la Orden de Empleo:

8. Job Order Expiration Date / Fecha de Vencimiento o Expiración de la Orden de Empleo:

7-21-18

9. Anticipated Period of Employment / Período anticipado o previsto de Empleo:

From / Desde: 06/25/2018    To / Hasta: 08/17/2018

10. Number of Workers Requested / Número de Trabajadores Solicitados

27 WORKERS/27 TRABAJADORES

11. Anticipated Hours of Work per Week / Horas Anticipadas/Previstas de Trabajo por Semana. Total: 36 HOURS/36 HORAS

Sunday / Domingo  0        Thursday /Jueves  6
Monday / Lunes  6          Friday / Viernes  6
Tuosday / Martes  6        Saturday / Sábado  6
Wednesday / Miercoles  6

12. Anticipated range of hours for different seasonal activities. / Rango previsto de horas par alas diferentes actividades de la temporada:

7:00 A.M.- 1:00 P.M.

13. Collect Calls Accepted from: / Aceptan Llamadas por Cobrar de

Employer / Empleador:    Yes / Sí ☐   No ☒

RECEIVED

MAR 2 9 2018

Missouri FLC Unit

14. Describe how the employer intends to provide either 3 meals a day to each worker or furnish free and convenient cooking and kitchen facilities for workers to prepare meals / Describa cómo el empleador tiene la intención de ofrecer, ya sea 3 comidas al día a cada trabajador, o proporcionar gratuitamente instalaciones para cocinar.

The employer will provide free and convenient cooking and kitchen facilities to workers, living in employer provided housing, which will enable workers to prepare their own meals. Employer will provide transportation (at no cost to employees) to grocery and/or department store, once per week, for workers to obtain food and other necessities.

El patron le proporcionará instalaciones gratis y convenientes para que el trabajador pueda concinar y preparar sus comidas, en las viviendas proporcionadas por el patron. El patron proporcionara el transporte (sin ningun costo a el empleado) a la tienda de comida y/o de departamento, una vez por semana, para que el trabajador compre su comida y otras necesidades.

RECEIVED

MAR 2 9 2018

Missouri FLC Unit

15.  Referral Instructions and Hiring Information / Instrucciones sobre cómo Referir Candidatos/Solicitantes - (Explain how applicants are to be hired or referred, and the Employer's/Agent's available hour to interview workers / Explique cómo los candidatos serán contratados o referidos, y las horas disponibles del empleador/agente para entrevistar a los trabajadores). See instructions for more details / Vea las instrucciones para más detalles.

All referrals are to be made to Jorge Marin by calling (229) 456-1897.  Collect calls will not be accepted.
All referrals are encouraged to contact their nearest career center prior to contacting the employer.  The employer will contact all applicants, who have submitted an application, by phone, to conduct an interview.  Prior to referral, each applicant should read, or have read to them a copy of the job order.  All applicants should have a clear understanding of the terms and conditions of employment as noted in the job order.  All applicants, if hired, are expected to work for the total period of employment as stated in the job order.  All applicants, if hired, should be available for work as described in the "Job Activities" section in the job order.  All applicants referred to the employer, if hired, will provide the following:  original identification and employment eligibility documents.

Employer will be available Monday to Thursday from 10:00 A.M. to 12:00 P.M. and from 1:00 P.M. to 2:00 P.M., to conduct interviews of referred workers, at no cost to the worker.
*See Attachment #15

16.  Job description and requirements / Descripción y requisitos del trabajo:

*See Attachment #16
*Vea Accesorio #16

1.  Is previous work experience preferred? / Se prefiere previa experiencia?   Yes / Si ☒   No ☐   If yes, number of months preferred  / Si es así, numero de meses de experiencia  1 month verifiable experience in fruit or vegetable commercial harvesting

2.  Check all requirements that apply:

☐ Certification/License Requirements / Certificación/Licencia Requisitos
☐ Driver Requirements / Requisitos del conductor
☐ Employer Will Train / Empleador entrenará o adiestrará
☐ Extensive Sitting / Estar sentado largos ratos
☒ Exposure to Extreme Temp. / Expuesto a Temperaturas Extremas
☒ Lifting requirement / Levantar o Cargar  0-75 lbs./libras
☒ Repetitive Movements / Movimientos repetitivos

☐ Criminal Background Check / Verificación de antecedentes penales
☐ Drug Screen / Detección de Drogas
☒ Extensive Pushing and Pulling / Empujar y Jalar Extensamente
☒ Extensive Walking / Caminar por largos ratos
☒ Frequent Stooping / Inclinándose o agachándose con frecuencia
☐ OT/Holiday is not mandatory / Horas Extras (sobre tiempo) / Dias Feriados no obligatorio

RECEIVED

MAR 29 2018

Missouri PLC Unit

**17.   Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas)**

| Crop Activities<br><br>Cultivos | Hourly Wage<br><br>Salario por Hora | Piece Rate /<br>Unit(s)<br><br>Pago por Pieza /<br>Unidad(es) | Special Pay<br>(bonus, etc.)<br><br>Pagos Especiales<br>(Bono, etc.) | Deductions*<br><br>Deducciones | Yes/Si | No | Pay Period /<br>Periodo de Pago<br>/      / |
|---|---|---|---|---|---|---|---|
| WATERMELON | $ 13.42 | $ N/A | n/a | Social Security /<br>Seguro Social | ☒ | ☐ | Weekly / Semanal |
| Field Cutters | $ n/a | $ 20.00 per bus,<br>paid to group | n/a | Federal Tax /<br>Impuestos<br>Federales | ☒ | ☐ | ☒ |
| Field Loaders | $ n/a | $ 80 per bus,<br>paid to group | n/a | State Tax<br>/Impuestos<br>Estatales | ☒ | ☐ | Bi-weekly/<br>Quincenal |
| Drivers | $ n/a | $ 7.00 per round<br>trip from field to<br>packing shed | n/a | Meals / Comidas | ☐ | ☒ | |
| Packing Shed Unloaders | $ n/a | $ 20 per bus,<br>paid to group | n/a | Other (specify) /<br>Otro (especifica) | ☒ | ☐ | Monthly/Mensual |
| Packing Shed Line Worker | n/a | $60 per bus, paid<br>to group | n/a | | | | ☐ |
| | | | | | | | Other/Otro<br><br>☐ |

18.   More Details About the Pay / Mas Detalles Sobre el Pago.

   *See Attachment #18

19.   Transportation Arrangements / Arreglos de Transportación

   All employer provided worker transportation meets the requirements of applicable Federal, State, and Local
   Laws and Regulations. All workers will be picked up every morning at the living facilities mentioned on Item #3
   of ETA form 790.
   *See Attachment #19

   Todo el transporte que el patron proporcione para el trabajador, cumple con los requisitos de las regulaciones y leyes
   aplicables, federales, estatales, y locales. Recogerán a todos los trabajadores cada mañana en las viviendas
   mencionadas en el articulo #3 de la forma ETA 790.
   *Vea Accesorio #19

RECEIVED

- 4 -

MAR 2 9 2018

Missouri FLC Unit

20. Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, and/or pay workers for this (these) crop activity (ies)? / ¿Es la práctica habitual usar Contratistas de Trabajo Agrícola para reclutar, supervisar, transportar, dar vivienda, y/o pagarle a los trabajadores para este(os) tipo(s) de cosecha(s)?          Yes / Sí  ☐          No ☒

   If you have checked yes, what is the FLC wage for each activity? / Si contestó "Sí," cuál es el salario que le paga al Contratista de Trabajo Agrícola por cada actividad?

21. Are workers covered for Unemployment Insurance? / ¿Se le proporcionan Seguro de Desempleo a los trabajadores?          Yes/Sí ☒   No ☐

    *THIS ONLY APPLIES TO DOMESTIC WORKERS

22. Are workers covered by workers' compensation? / ¿Se le provee seguro de compensación/indemnización al trabajador:          Yes/Sí ☒   No ☐

23. Are tools, supplies, and equipment provided at no charge to the workers? / ¿Se les proveen herramientas y equipos sin costo alguno a los trabajadores?

                                                                                                     Yes/Sí ☒   No ☐

24. List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers. (If there are no such arrangements, enter "None".) / Enumere todos los acuerdos o convenios hechos con los propietarios del establecimiento o sus agentes para el pago de una comisión u otros beneficios por ventas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, indique "Ninguno".)

    NONE/NINGUNO

25. List any strike, work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed. (If there are no such incidents enter "None".) / Enumere toda huelga, paro o interrupción de operaciones de trabajo por parte de los empleados en el lugar de empleo. (Si no hay incidentes de este tipo, indique "Ninguno".)

    NONE/NINGUNO

RECEIVED

MAR 2 9 2018

Missouri FLC Unit

26. Is this job order to be placed in connection with a future Application for Temporary Employment Certification for H–2A workers? / ¿Esta orden de empleo ha sido puesta en conexión con una futura solicitud de certificación de empleo temporal para trabajadores H-2A?

Yes/Sí☒   No ☐

27. Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job. / Certificación del Empleador. Esta orden de trabajo describe los términos y condiciones del empleo que se le ofrece. y contiene todos los términos y condiciones materiales ofrecidos.

Jorge Marin/President

Employer's Printed Name & Title / Nombre y Título en Letra de Molde/Imprenta del Empleador

_Jorge Marin_                                           _02/29/2018_
Employer's Signature / Firma y Título del Empleador          Date / Fecha

**READ CAREFULLY.** In view of the statutorily established basic function of the Employment Service as a no-fee labor exchange. that is, as a forum for bringing together employers and job seekers, neither the Employment and Training Administration (ETA) nor the State agencies are guarantors of the accuracy or truthfulness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the American Job Center constitute a contractual job offer to which the American Job Center, ETA or a State agency is in any way a party.

**LEA CON CUIDADO.** En vista de la función básica del Servicio de Empleo establecida por ley, como una entidad de intercambio laboral sin comisiones, es decir, como un foro para reunir a los empleadores y los solicitantes de empleo, ni ETA ni las agencias del estado pueden garantizar la exactitud o veracidad de la información contenida en las órdenes de trabajo sometidas por los empleadores. Ni ninguna orden de trabajo aceptado o contratado en el Centro de Carreras (American Job Center) constituyen una oferta de trabajo contractuales a las que el American Job Center, ETA o un organismo estatal es de ninguna manera una de las partes.

**PUBLIC BURDEN STATEMENT**
The public reporting burden for responding to ETA Form 790, which is required to obtain or retain benefits (44 USC 3501), is estimated to be approximately 60 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and reviewing the collection. The public need not respond to this collection of information unless it displays a currently valid OMB Control Number. This is public information and there is no expectation of confidentiality. Send comments regarding this burden estimate or any other aspect of this collection, including suggestions for reducing this burden, to the U.S. Department of Labor, Employment and Training Administration, Office of Workforce Investment, Room C-4510, 200 Constitution Avenue, NW, Washington, DC 20210.

**DECLARACION DE CARGA PÚBLICA**
La carga de información pública para responder a la Forma ETA 790, que se requiere para obtener o retener beneficios (44 USC 3501), se estima en aproximadamente 60 minutos por respuesta, incluyendo el tiempo para revisar las instrucciones, buscar fuentes de datos existentes, recopilar y revisar la colección. El público no tiene por qué responder a esta recopilación de información a menos que muestre un número de control OMB válido. Esta información es pública y no hay ninguna expectativa de confidencialidad. Envíe sus comentarios acerca de esta carga o cualquier otro aspecto de esta colección, incluyendo sugerencias para reducir esta carga, al U.S. Department of Labor, Employment and Training Administration, Office of Workforce Investment, Room C-4510, 200 Constitution Avenue, NW, Washington, DC 20210.

RECEIVED

MAR 2 9 2018

MISSOURI  PLACEMENT

28.  Use this section to provide additional supporting information (including section Box number).  Include attachments, if necessary. / Utilice esta sección para proporcionar información adicional de apoyo; incluya  el numero de la sección e incluya  archivos adjuntos, si es necesario.

RECEIVED

MAR 2 9 2018

MISSOURI P.S. DEP

**20 CFR 653.501**
**Assurances**

**INTRASTATE AND INTERSTATE CLEARANCE ORDER**

The employer agrees to provide to workers referred through the clearance system the number of hours of work per week cited in Item 11 of the clearance order for the week beginning with the anticipated date of need, unless the employer has amended the date of need at least 10 working days prior to the original date of need by so notifying the Order-Holding Office (OHO).  If the employer fails to notify the OHO at least 10 working days prior to the original date of need, the employer shall pay eligible workers referred through the intrastate/interstate clearance system the specified hourly rate or pay, or in the absence of a specified hourly rate or pay, the higher of the Federal or State minimum wage rate for the first week starting with the original anticipated date of need.  The employer may require workers to perform alternative work if the guarantee is invoked and if such alternative work is stated on the job order.

The employer agrees that no extension of employment beyond the period of employment shown on the job order will relieve the employer from paying the wages already earned, or specified in the job order as a term of employment, providing transportation or paying transportation expenses to the worker's home.

The employer assures that all working conditions comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration and other employment-related laws.

The employer agrees to expeditiously notify the OHO or State agency by telephone immediately upon learning that a crop is maturing earlier or later, or that weather conditions, over recruitment, or other factors have changed the terms and conditions of employment.

The employer, if acting as a farm labor contractor, has a valid farm labor contractor registration certificate.

The employer assures the availability of no cost or public housing which meets applicable Federal and State standards and which is sufficient to house the specified number of workers requested through the clearance system.

The employer also assures that outreach workers shall have reasonable access to the workers in the conduct of outreach activities pursuant to 20 CFR 653.107.


Employer's Name _____Jorge Marin_____      Date: _03 - 29 - 2018_


Employer's Signature _____


**Besides the material terms and conditions of the employment, the employer must agree to these assurances if the job order is to be placed as part of the Agricultural Recruitment System.  This assurance statement must be signed by the employer, and it must accompany the ETA Form 790.**

RECEIVED

MAR 2 9 2018

Missouri FLC Unit

ETA Form 790 Attachment
Page 1, Item #2

Marin J. Corp.
Season 2018
Watermelon Harvesting Itinerary

| Block Name | Crop | Address/Directions | County | Beginning Picking Date | Ending Picking Date |
|---|---|---|---|---|---|
| #1 Donny Shop Field | Watermelon | 18942-19220 County Rd. 522 Kennett, MO 63857 | Dunklin | 6/25/2018 | 8/17/2018 |
| #2 Crow 40 Field | Watermelon | 15000-15714 County Rd. 500 Kennett, MO 63857 | Dunklin | 6/25/2018 | 8/17/2018 |
| Field #3 | Watermelon | 13267 State Highway A Kennett, MO 63857 | Dunklin | 6/25/2018 | 8/17/2018 |
| Field #4 | Watermelon | Honersville, MO 63855 | Dunklin | 6/25/2018 | 8/17/2018 |
| Field #5 | Watermelon | Honersville, MO 63855 | Dunklin | 6/25/2018 | 8/17/2018 |
| Field #6 | Watermelon | Senath, MO 63876 | Dunklin | 6/25/2018 | 8/17/2018 |
| Field #7 | Watermelon | Senath, MO 63876 | Dunklin | 6/25/2018 | 8/17/2018 |

E:\Marin J. Corp.-(NFL) Watermelon Harvesting Itenerary 03132018

RECEIVED

MAR 2 9 2018

Missouri ELC Unit

**Attachment #3**
The employer will provide free housing to those workers who are not able to return to their residence within the same day which meets applicable local, state, and federal housing standards.   However, the employer will require workers to reimburse the employer for damage caused to the housing by the individual worker(s) found to have been responsible for damage which is not the result of normal wear and tear related to habitation.   Workers will be responsible for maintaining housing in a neat, clean manner, as well as follow the housing rules which are attached.   Female workers will be provided separate bathroom facilities.

*El patrón proporcionará vivienda gratuita a los trabajadores que no puedan volver a su residencia dentro de el mismo día que que cumpla con los estándares locales, estatales, y federales de viviendas. Sin embargo, el patrón requerirá a los trabajadores reembolsar al patrón por daños causados a la vivienda hechos por los trabajadores que se encuentren responsible por haber hecho los daños que no sean el resultado del desgaste normal y de rasgónes relacionados con la habitación. Los trabajadores serán responsables de mantener la vivienda de una manera aseada, limpia, y seguir las reglas de la vivienda que se encuentran atadas a esta forma.   A las trabajadoras de sexo femenino, se les proporcionará un baño separado.*

Family Housing: (Check the appropriate box)
　　　ⴵFamily housing is not available and the provision of family housing is not a prevailing practice in the area of intended employment.
　　　⬜ Free family housing is
available.
　　　⬜ Family housing is available.   The provision of family housing is not a prevailing practice in the area of intended employment.   Families will be charged ＿＿＿ per week for utilities.

*Vivienda familiar: (Compruebe la caja apropiada)*
　　　ⴵ*Las viviendas de familia no están disponible y la disposición de las viviendas de familia no son una práctica que prevalece en está area de empleo previsto.*
　　　⬜*Las viviendas de familia gratuitas si están disponible.*
　　　⬜*Las viviendas de Familia si están disponible. La disposición de las viviendas de familia no son una práctica que prevalece en está area de empleo previsto.   Las familias serán cobradas ＿＿＿ por semana para cubrir el costo de las utilidades.*

**Attachment #11**
A copy of the work contract or a copy of the ETA 790 in lieu of a work contract and any modifications will be provided to the worker on the day the worker commences employment or as soon as practically possible.

*Una copia del contrato de trabajo o una copia del ETA 790 en lugar de un contrato de trabajo y cualquier modificación será proporcionada al trabajador en el día que el trabajador comienza el empleo o lo mas pronto como prácticamente sea posible.*

RECEIVED
1
MAR 2 9 2018

MISSOURI R&C USA

Attachments to ETA 790

**Attachment #11 (continued)**
Employer will offer work on Sunday, but employee is not required to work on Sunday.

*El patrón ofrecerá el trabajo el domingo, pero no requieren al empleado trabajar el domingo.*

The employer will keep accurate and adequate records of each worker. The worker, worker's representative, and the any authorized representative of the secretary of Labor will be given access to the records of the worker's earnings.

*El patrón guardará expedientes exactos y adecuados de cada trabajador. Se le dara a el trabajador, el representante del trabajador, y cualquier representante autorizado de la secretaria del trabajo el acceso a los expedientes de las ganancias del trabajador.*

The employer will provide each worker an Hours and Earnings Statement that meets the requirements of the Federal and Missouri State Requirements. In accordance with Departmental regulations 20 CFR sec. 655.122(k) the employer will furnish the worker on or before each payday in one or more written statements the following information:
1.  The worker's total earning for the pay period.
2.  The worker's hourly rate and/or piece rate pay.
3.  The hours of employment offered to the worker (showing offers in accordance with the Three-fourths Guarantee as determined in paragraph (i) of this section, separate from any hours offered over and above the guarantee.)
4.  The hours actually worked by the worker.
5.  An itemization of all deductions made from the worker's wages.
6.  If piece rates are used, the units produced daily;
7.  Beginning and ending date of the pay period;
8.  The employer's name, address, and FEIN.

*El patrón proporcionará a cada trabajador Una Declaración de Las Ganancias y Las Horas Trabajadas que cumpla con los requisitos Federales y del estado de Missouri.  De acuerdo con las regulaciones Departamentales 20CFR sec. 655.122(k) el patron le dara a cada trabajador en el dia de pago o antes en una o mas formas por escrito la informacion siguiente:*
1.  *Las ganancias total para el period de pago del trabajador.*
2.  *El pago de redito por hora y/o redito de pago por pieza del trabajador.*
3.  *Las horas ofrecidas al trabajador (que enseñen las ofertas de acuerdo con la garantia de ¾ del contrato, como es determinado en parafo (i) en esta seccion, aparte de culquier horas ofrecidas que sean mas o menos de esta guarantia.)*
4.  *Las horas actuals que sean trabajadas por el trabajador.*
5.  *Una lista detallada de todas las deducciones hechas del pago del trabjador.*
6.  *Si redito por pieza es usado, las unidades producidas por dia;*
7.  *La fecha que comienza y termina el periodo de pago;*
8.  *El nombre del empleado, domicilio, y FEIN.*

**Attachment #15**
*Todas las remisiones deben ser hechas a Jorge Marin, llamando al (229) 456-1897. Llamadas por cobrar no serán aceptadas.  Todos los remitantes deben contactar*

RECEIVED
2
MAR 2 9 2016
Chicago NPC PLC Unit

**Attachment #15 (continued)**

*a su centro de carreras más cercano antes de entrar en contacto con al patrón. El patrón entrará en contacto con todos los aspirantes que han presentado una solicitud, por teléfono, para conducir una entrevista. El patrón estara disponible Lunes a Jueves de las 10:00 P.M. al las 12:00 p.m. y de 1:00 P.M a 2:00 P.M. para las entrevistas de los trabajadores referidos, sin ningun costo al trabajador.*

*Antes de la remisión cada aspirante debe leer o que se le haiga leído una copia de la orden de trabajo. Todos los aspirantes deben tener un entendimiento claro sobre las condiciones del empleo según lo observado en la orden de trabajo. Se espera que todos los aspirantes trabajen para el período total de empleo según lo indicado en la orden de trabajo. Todos los aspirantes deben estar disponibles y estar a la discreción del patron para el trabajo según lo descrito en la sección de las Actividades del Trabajo en la orden de trabajo. Todos los aspirantes refiridos al patrón, si son empleados, proporcionar lo siguiente: identificación original y documentos de elegilibilidad para el trabajo.*

**Attachment #16**

The worker will perform job duties as assigned by supervisor. They will vary from time to time depending on crop ripening and weather. The watermelon harvesting is temporary and will last from June to August.

Watermelon Hand Harvesting-In order to perform this kind of work, the worker must be able to walk down the field row and use a knife to hand cut ripe watermelons off the vine for harvesting.   The watermelons are then loaded in a bus by forming part of an assembly line, in which the first worker bends down picks up the watermelon and it is passed on to consecutive workers by passing, catching, lifting, until it reaches the worker on the bus, who then sets it down and stacks them until the bus is considered full.

Watermelon Packing- The watermelon is transported by bus to the packing shed.   Upon its arrival, it is unloaded by a group of workers and placed on a conveyer belt.   The group of workers on the conveyer belt are responsible for sorting, labeling, and packing the watermelon in cardboard containers.   While the workers are waiting on the next load of watermelons to arrive, they will be responsible for assembling card board containers.

The worker must be able to work outside for 6 hours a day in all kinds of weather including, but not limited to extreme cold and hot conditions, direct sunlight, and rain. Workers must have the required physical strength and endurance to repeat the process rapidly and skillfully involved in this type of work.   Workers will perform prolonged walking, bending, stooping, reaching, pushing, pulling, lifting, and carrying 0-75 lbs. Due to the nature of this type of work, there will be a Probationary Period of six (6) days beginning on the first day of employment for the employee to acclimate to the job specifications listed under the Job Descriptions and Requirements. The worker will be given specific instructions as to how to properly perform the work specified in the Job Description and Requirements Section on the first day of work.   Workers who do not perform the work as specified, may be terminated.

**Attachment #16 (continued)**
The employer will provide the tools necessary to perform the described job duties
without charge to the worker.   The employer will charge the worker for reasonable costs
related to the worker's refusal or negligent failure to return the tools or due to such
worker's willful damage or destruction of the tools.

*El trabajador realizará deberes asignados según las instrucciones dadas por su
supervisor.   Los deberes varían de tiempo a tiempo conforme esta el clima y la madurez
del la cosecha.   La cosecha de sandía es temporal y dura de Abril a Mayo.*

*Cosecha a mano de Sandía -  Para realizar esta clase de trabajo, el trabajador debe
caminar por los surcos del fil y usando una navaja, cortar la sandía madura de la viña
para cosecharla.   Despues, los trabajadores forman parte de un linea de asemblea.   El
primer trabajador recoje la sandía del suelo y la va pasando, agarrando, y levantando
hasta llegar al autobus.   Se la entregan al trabajador que esta adentro del autobus y
este va apilando las sandias hasta que el camion es considerado lleno.*

*Embalar Sandia -La sandía es transportada en autobús a la bodega para ser embalada.
A su llegada, es descargado por un grupo de trabajadores y colocado en una cinta
transportadora. El grupo de trabajadores en la cinta transportadora es responsable de
clasificar, etiquetar y embalar la sandia en las cajas de cartón. Mientras esperan el
siguinte viaje de sandía, el grupo de trabajadores sera responsible de armar las cajas de
cartón.*

*El trabajador debe poder trabajar afuera por 6 horas al día en todo tipo de clima
incluyendo, pero no limitado a condiciones extremas de frío y calor, luz solar directa, y
lluvia. Los trabajadores deben tener la fuerza física requerida y la resistencia para
repetir el proceso, rápidamente y hábilmente, involucrados con este tipo de trabajo. Los
trabajadores realizarán caminatas prolongadas, estaran doblados, agachados,
alcanzaran, empujaran, tiraran, llevaran, y levantaran peso de 0-75 libras. Debido a la
naturaleza de este tipo de trabajo, habrá un período de prueba de cinco seis (6) días,
comenzando con el primer día de empleo, para que el empleado se adapte a las
especificaciones de trabajo enumeradas bajo las Descripciones y Requisitos del Trabajo.
En el primer día de trabajo, se le dará al trabajador instrucciones específicas cómo
realizer correctamente el trabajo especificado en la Sección de Descripción y Requisites
del Trabajo.   Los trabajadores que realizan el trabajo como se especifica en esta
petición pueden ser terminados.*

*El patrón proporcionará las herramientas necesarias para realizar los deberes escritos
del trabajo. El patrón le cobrara una quota rasonable al trabajador por los costos
relacionados con la denegación o la falta negligente del trabajador de volver las
herramientas o debido al daño voluntarioso o a la destrucción de tal herramientas por el
trabajador.*

4 RECEIVED

MAR 2 9 2019

Missouri PLC Unit

**Attachment # 18**

a. To comply with its obligation under § 655.122(1), an employer must offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the federal or state minimum wage, except where a special procedure is approved for an occupation or specific class of agricultural employment.

*a. Para conformarse conlal obligación bajo § 655.122 (1), un patrón debe ofrecer, hacer publicidad en él reclutamiento, y pagar un salario que sea el más alto del AEWR, el salario de cada hora o la tarifa de pedazo que prevalece, el salario acordado en la negociación colectiva, o el federal o el salario mínimo estatal, excepto donde está aprobado un procedimiento especial para una ocupación o una clase específica de empleo agrícola.*

b.   If the prevailing hourly wage rate or piece rate is adjusted during a work contract, and is higher than the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, in affect at the time the work is performed; the employer must pay that higher prevailing wage or piece rate upon notice to the employer by the department.

*b. Si la tarifa de salario de cada hora que prevalece o la tarifa de pedazo se ajusta durante un contrato de trabajo, y es más alto de el más alto del AEWR, el salario que prevalece, el salario acordado de la negociación colectiva, o el salario mínimo Federal o Estatal, en effecto cuando se realiza el trabajo, el patrón deben pagar el salario que prevalece o la tarifa de pedazo más alta sobre aviso al patrón por el departamento.*

c. The OFLC Administrator will publish, at least once in each calendar year, on a date to be determined by the OFLC Administrator, the AEWRs for each State as a notice in the Federal Register.

*c. El administrador de OFLC publicará, por lo menos una vez en cada año civil, una fecha que se determinará por el administrador de OFLC, los AEWRs para cada estado como aviso en el registro federal.*

d. Most of the jobs associated with this employment are paid by the piece rate, however $13.42 per hour (or a higher or lower AEWR in effect at the time the work is performed) or a higher prevailing wage rate, if applicable, is guaranteed as a minimum for all hours worked during a pay period.   If the worker's total pay for the pay period from piece rate earnings and hourly wages divided by his total hours worked during that pay period results in average hourly earnings of less than the guaranteed hourly rate, the worker will be provided build-up pay to the guaranteed minimum hourly rate.

*d. La mayor parte de los trabajos asociados con este empleo son pagados por el índice de pedazo, sin embargo $13.42 por hora (o un AEWR más alto o más bajo en efecto en el momento en que se realiza el trabajo) o una tarifa de salario que*

RECEIVED
5
MAR 2 9 2018
Wisdot Plu....

Attachments to ETA 790

**Attachment # 18 (continued)**

*prevalece más alta, si fuera aplicable, se garantiza como mínimo por todas las horas trabajadas durante un período de paga. Si la paga total del trabajador para el período de paga de ganancias de la tarifa de pedazo y de salarios por hora dividió por sus horas totales trabajadas durante ese periodo de paga resulta en un promedio de ganancia por hora menos que el precio por hora garantizado, el trabajador será proveído pago de acumulación por la tarifa mínima garantizada.*

e. The employer will make the following deductions:  FICA taxes, income tax, cash advances, overpayment of wages, and charges for any loss to the employer due to the workers damage or loss of equipment or housing items where it is shown that the worker is responsible, and any other deductions expressly authorized by the worker in writing. State income tax will be deducted.

*e. El patrón hará las deducciones siguientes: Los impuestos de FICA, el impuesto sobre la cantida de paga, los anticipos, el pago excesivo de salarios, y las cargas para cualquier pérdida al patrón debido a los trabajadores dañando o pérdida de artículos del equipo o de la vivienda donde se demuestra que el trabajador es responsable, y cualquiera otras deducciones sean autorizadas por el trabajador por escrito. Se deducirá impuesto sobre la cantida de paga estatal.*

f. Employer will not pay the worker a bonus based on quality picking or at the end of season.

*f. El patrón no pagará al trabajador una prima basada en la cosecha de la calidad o en finales de la cosecha.*

g. ¾ of Work Guarantee:  The employer will guarantee the worker employment for at least three-fourths of the workdays of the total period during which the work contract and all extensions thereof are in effect, beginning with the first workday after the arrival of the worker at the place of employment and ending on the expiration date specified in the work contract or in its extension, if any.  If the employer affords the worker during the total work contract period less employment than the required under this work guarantee, the employer shall pay such worker the amount which the worker should have earned had the worker in fact worked for the guaranteed number of days.  For purposes of this guarantee, a workday shall mean the number of hours in a work on a single workday, including the worker's Sabbath and federal holiday.  For purposes of meeting the guarantee, however, the worker shall not be required to work for more than the number of hour specified in this job order for a workday, or on the worker's Sabbath or federal holiday.  In determining whether the guarantee of employment has been met, any hours which the worker fails to work during a workday when the worker is afforded the opportunity to do so by the employer and hours of work performed, shall be counted in calculating the employment guarantee. The employment guarantee may be abated by the employer before the expiration date specified in the work contract for reasons beyond the employees control due to an act of God employment before the end of the contract period or in the event the worker is terminated for lawful job-related reason.  The employer

RECEIVED

6

MAR 2 9 2016

Missouri FLC Off

**Attachment # 18 (continued)**

will not be liable for payment of the work guarantee with respect to an H-2A worker whom the Regional Administrator certifies is displaced because of the employer's compliance with the 50 percent rule.

g. ¾ de la Garantía del Trabajo: El patrón garantizará el empleo por lo menos tres cuartos de los días laborables que se le ofrecen al trabajador durante el período total durante el cual el contrato de trabajo y todas las extensiones de eso están en efecto, comenzando con el primer día laborable después de la llegada del trabajador en el lugar del empleo y terminando en la fecha de vencimiento especificada en el contrato de trabajo o en su extensión, si la hay. Si el patrón produce al trabajador durante el plazo de ejecución total de trabajo menos empleo que requerido bajo esta garantía del trabajo, el patrón pagará a tal trabajador la cantidad que el trabajador hubiera ganado si el trabajador hubiera trabajado el número de días garantizados en el contrato. Con objeto de esta garantía, un día laborable significará el número de horas en un trabajo sobre un solo día laborable, incluyendo el día religioso del trabajador y el día de fiesta federal. Con objeto de resolver la garantía, el trabajador no sera required a trabajar más horas que el número de horas por día laboral especificadas en esta orden de trabajo, o en el día religioso, o el día de fiesta federal del trabajador. En la determinación de si, la garantía del empleo sera resuelta, cuando el trabajador no quiera trabajar durante un día laborable donde el patrón le haigo ofrecido trabajo y el trabajador no haigo quierido trabajar estas horas laborables de trabajo seran contadas en el cálculo de la garantía del empleo. La garantía del empleo se puede disminuir o ser cancelada por el patrón antes de la fecha de vencimiento especificada en el contrato de trabajo por razones más allá del control del patron o por fuerzas mayores. El patrón no será obligado para el pago de la garantía del trabajo con respecto a un trabajador de H-2A que el administrador regional certifique se desplace debido a la conformidad del patrón con la regla del 50 por ciento.

h. Payroll periods will be weekly.

h. Los períodos de nómina de pago serán semanales.

i. The employer will provide workers referred through the interstate clearance system 36 hours of work for the week beginning with the anticipated date of need unless the employer has amended the date of need by notifying the local Job Service Office no later than 10 days before the date of need. If the employer fails to notify the order-holding office, then the employer shall pay an eligible worker referred through the clearance system $483.12, the appropriate wage alternative work if the guarantee cited in this section is invoked.

i. El patrón proveerá a los trabajadores referidos a través del Interstate Clearance System 36 horas de trabajo empesando con la primera semana de la fecha anticipada de la necesidad a menos que el patrón haya enmendado la fecha de la necesidad notificando la oficina local del servicio del trabajo por lo menos 10 días antes de la fecha de la

RECEIVED
7

MAR 2 9 2018

**Attachment # 18 (continued)**
*necesidad. Si el patrón no puede notificar la oficina que tiene la orden de trabajo, el patrón pagará a un trabajador elegible referido a través del Interstate Clearance System $483.12, el trabajo alternativo del salario apropiado si la garantía citada en esta sección se invoca.*

**Attachment # 19**
After the worker has completed 50% of the work period, the employer will reimburse the worker for the cost of transportation and subsistence expenses of at least $12.26 per day with no receipts and a maximum of $51.00 per day with receipts.   This covers the cost from the place of recruitment to the place of employment.   Upon completion of the work contract the employer will pay reasonable costs of return including transportation and subsistence from place of employment to place of recruitment.   The employer will pay $12.26 per day with no receipts and up to $51.00 per day with receipts.   This is true, except when the worker will not be returning to the place of recruitment, due to subsequent employment with another employer, who agrees to pay such costs.   In this case the employer will only pay for transportation and subsistence to the next job.   The amount of the transportation payment will be equal to the most economical and reasonable similar common carrier transportation charges for the distance involved. These arrangements apply only to workers for whom the employer is legally obligated to supply housing.

Free transportation will be provided from the employer provided housing to the work site and back, for workers living in that housing and for commuting workers, if they need transportation to the harvesting site.

*Después de que el trabajador haya terminado el 50% del período del trabajo, el patrón reembolsará al trabajador para el coste de transporte y de gastos de estancia de por lo menos $12.26 por día sin recibos y un máximo de $51.00 por día con los recibos. Esto cubre el coste del lugar del reclutamiento al lugar del empleo. Sobre la terminación del contrato de trabajo el patrón pagará costes razonables de vuelta incluyendo el transporte y de subsistencia del lugar del empleo al lugar del reclutamiento. El patrón pagará $12.26 por día sin recibos y hasta $51.00 por día con los recibos. Esto es verdad, a menos que cuando el trabajador no vuelva al lugar del reclutamiento, debido al empleo subsecuente con otro patrón, que acuerda pagar tales costos. En este caso el patrón pagará solamente el transporte y la subsistencia al trabajo siguiente.  La cantidad del pago del transporte será igual a las cargas de transporte similares más económicas y más razonables del portador común para la distancia implicada. Este arreglo se aplica solamente a los trabajadores para quienes obligan al patrón legalmente a suministrar vivienda.  Transporte gratis será proporcionado de la vivienda proporcionada por el patrón al sitio de trabajo, para los trabajadores que viven en las viviendas proveídas por el patrón y para los trabajadores que viajan, si necesitan el transporte al sitio de cosecha.*

RECEIVED
8
MAR 2 9 2019

ORLANDO NPC OFC

Attachments to ETA 790

**Additional Assurance Addendum**

**Reporting Abandonment of Employment or Termination for Cause**
The employer will report workers who, (a) voluntarily abandon employment before the end of the contract period, or (b) workers who are terminated for cause, to the Chicago National Processing Center, and H-2A workers to the Department of Homeland Security, in writing or other approved method, not later than two (2) days after the abandonment or termination occurs. Abandonment will be deemed to begin after a worker fails to report for work at the regularly scheduled time for five (5) consecutive working days without the consent of the employer. The employer will not be responsible for providing or paying for reported workers (a) subsequent transportation and subsistence expenses, and (b) the worker will not be entitled to the ¾ guarantee."

In the event of termination resulting from an Act of God, the employer will provide or pay reasonable cost of return transportation and subsistence to the place of recruitment.

*Adenda de Garantía Adicional*
*Reportando el Abandono de Empleo o Rescisión Por Causa*
*El patrón divulgará los trabajadores que, (a) voluntariamente abandone el empleo antes del final del plazo de ejecución, o (b) a los trabajadores que se terminan por causa, al Centro de Proceso Nacional de Chicago, y los trabajadores de H-2A al Departamento de Seguridad de Patria, por escrito o por otro método aprobado, no más tardo de (2) días después del abandono o de la terminación. El abandono será juzgado después de que un trabajador no se reporte al trabajo a la hora que este regularmente programada por cinco (5) días laborables consecutivos sin el consentimiento del patrón. El patrón no será responsable de proporcionar o de pagar trabajadores divulgados (a) el transporte y gastos de estancia subsecuentes, y (b) no darán derecho el trabajador a la garantía del ¾. "*

*En el acontecimiento de la terminación que resulta de un acto de Dios, el patrón proporcionará o pagará el coste razonable del transporte de regreso y de la subsistencia al lugar de reclutamiento.*

**Regulation 655.122(0) Contract Impossibility**
Contract Impossibility. If before the expiration date specified in the work contract, the services of the worker are no longer required due to an Act of God that makes the fulfillment of the contract impossible, the employer may terminate the work contract. Whether such an event constitutes a contract impossibility will be determined by the CO. In the event of such termination of a contract, the employer must fulfill a three-fourths guarantee for the time that has elapsed from the start of the work contract to the time of its termination, as described in paragraph (i)(1) of this section. The employer must make efforts to transfer the worker to other comparable employment acceptable to the worker, consistent with existing immigration law, as applicable. If such transfer is not affected, the employer must:
    (1) Return the worker, at the employer's expense, to the place from which the

RECEIVED

9
2 9 2018

Missouri ETC, USA



Attachments to ETA 790

**Regulation 655.122(0) Contract Impossibility(continued)**                    worker
(disregarding intervening employment) came to work for the employer, or transport the
worker to the worker's next certified H-2A employer, whichever the worker prefers;

(2) Reimburse the worker the full amount of any deductions made from the
worker's pay by the employer for transportation and subsistence expenses to the place of
employment; and

(3) Pay the worker for any costs incurred by the worker for transportation and
daily subsistence to that employer's place of employment.   Daily subsistence must be
computed as set forth in paragraph (h) of this section.   The amount of the transportation
payment must not be less (and is not required to be more) than the most economical and
reasonable common carrier transportation charges for the distances involved."

*Regulación 655.122 (0) Imposibilidades de Contrato*
*(0) Imposibilidad del contrato. Si antes de la fecha de vencimiento especificada en el*
*contrato de trabajo, los servicios del trabajador lla no se requieren por razones de otras*
*fuerzas mayores que hagan el cumplimiento del contrato imposible, el patrón puede*
*terminar al contrato de trabajo. Si tal acontecimiento constituye una imposibilidad del*
*contrato será determinada por el CO. En caso de tal terminación de un contrato, el*
*patrón debe satisfacer tres cuartos de la garantía por el tiempo que ha transcurrido del*
*comienzo del contrato de trabajo al tiempo de su terminación, según lo descrito en el*
*párrafo (i) (1) de esta sección. El patrón debe hacer esfuerzos para transferir al*
*trabajador al otro empleo comparable aceptable por el trabajador, constante con ley*
*existente de inmigración, como aplicable. Si tal transferencia no es afectada, el patrón*
*debe:*

*(1) Devolver al trabajador, al costo del patrón, al lugar de el cual el trabajador*
*(sin hacer caso del empleo de intervención) vino a trabajar para el patrón, o transporta*
*al trabajador al patrón certificado siguiente de H-2A del trabajador, el cual el*
*trabajador prefiere;*

*(2) Reembolsar al trabajador la cantidad completa de cualquier deducción que se*
*haiga hecho de la paga del trabajador de parte del patrón para el transporte y los gastos*
*de estancia al lugar del empleo; y*

*(3) Pagar al trabajador cualquier gastos qur haiga hecho el trabajador para la*
*tranportacion y la subsistencia diaria al lugar del empleo de ese patrón. La subsistencia*
*diaria se debe computar según lo dispuesto en el párrafo (h) de esta sección. La cantidad*
*del pago del transporte no debe ser menos (y no se requiere para ser más) que las cargas*
*de transporte más económicas y más razonables del portador común para las distancias*
*implicadas."*

**§655.120 Offered Wage Rate:**

RECEIVED

10

MAR 2 9 2018

WHD/CSET FLC Chic

Attachments to ETA 790

(a) To comply with its obligation under §655.122(1), an employer must offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed upon collective bargaining wage, or the Federal or State minimum wage, except where a special procedure is approved for an occupation or a specific class of agricultural employment.

(b) If the prevailing hourly wage rate or piece rate is adjusted during a work contract and is highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, in effect at the time the work is performed, the employer must pay the higher prevailing wage or piece rate, upon notice to the employer by the Department.

(c) The OFLC Administrator will publish, at least once in each calendar year, on a date to be determined by the OFLC Administrator, the AEWRs for each State as a notice in the Federal Register.

### Tarifa de salario ofrecida §655.120:

*(a) Para conformarse con su obligación debajo de §655.122 (1), un patrón debe ofrecer, publicar en su reclutamiento, y pagar un salario que sea el más alto del AEWR, el salario por hora o la tarifa de pedazo que prevalece, el salario convenido en la negociación colectiva, o el Federal o el que indique el salario mínimo, excepto donde está aprobado un procedimiento especial para una ocupación o una clase específica de empleo agrícola.*

*(b) Si la tarifa de salario de cada hora que prevalece o la tarifa de pedazo se ajusta durante un contrato de trabajo y es la más alta del AEWR, el salario que prevalece, el salario acordado de la negociación colectiva, o el Federales o lo que indica el salario mínimo, en efecto cuando se realiza el trabajo, el patrón deben pagar el salario que prevalece o la tarifa de pedazo más alto, sobre aviso al patrón por el Departamento.*

*(c) El Administrador de OFLC publicará, por lo menos una vez por año civil, una fecha que se determinará por el Administrador de OFLC, el AEWRs para cada estado como aviso en el Registro Federal.*

### Regulation 655.135(d) Fifty Percent Rule

From the time the foreign workers depart for the employer's place of employment, it must provide employment to any qualified, eligible U.S. workers who applies to the employer until 50 percent of the period of the work contract has elapsed.   Start of the work contract timeline is calculated from the first date of need stated on the *Application for Temporary Employment Certification*, under which the foreign worker who is in the job was hired.

### Regulation 655.122(0) Contract Impossibility(continued)

RECEIVED

MAR 2 9 2018
11

Missouri PLC

Attachments to ETA 790

***Regulación 655.135(d) Regla de Cincuenta Por Ciento***

*Desde el momento que salen los trabajeros extranjeros de el lugar de empleo del empleador, el empleador debe proporcionar empleo a cualquier trabajador Estadounidenses que aplique y que este calificado e elegible hasta que haya transcurrido la mitad del período del contrato de trabajo. El comienzo de tiempo del contrato de trabajo se calcula a partir de la primera fecha de necesidad indicada en la* Solicitud de Certificación de Empleo Temporal, *bajo el cual fue contratado el trabajador extranjero.*

**Regulation 20 CFR sec. 655.122(a) U. S. Worker Assurance**

Prohibition against preferential treatment of aliens. The employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers. Job offers may not impose on U.S. workers any restrictions or obligations that will not be imposed on the employer's H-2A workers. This does not relieve the employer from providing to H-2A workers at least the same level of minimum benefits, wages, and working conditions which must be offered to U.S. workers consistent with this section.

**Regulación 20 CFR sec. 655.122(a) Aseguramiento de Trabajador Estadounidense**

*Prohibición de tratamiento preferencial de los extranjeros. Oferta de empleo del empleador debe ofrecer a los trabajadores de Estados Unidos nada menos que los mismos beneficios, salarios y condiciones de trabajo que el empleador ofrece, se propone ofrecer, o proporcionará a los trabajadores H-2A. Ofertas de trabajo no pueden imponer a los trabajadores de los Estados Unidos cualquier restricciones o obligaciones que no se impondrá a los trabajadores H-2A del empleador. Esto no releva al empleador de proporcionar a los trabajadores H-2A por lo menos el mismo nivel de prestaciones mínimas, los salarios y las condiciones de trabajo que deben ser ofrecidas a los trabajadores estadounidenses consistentes con esta sección.*

RECEIVED

# EXHIBIT B

**U.S. Department Labor**
**Employment and Training Administration**

OMB Control No. 1205-0134
Expiration Date: March 31, 2019

### Agricultural and Food Processing Clearance Order ETA Form 790
### Orden de Empleo para Obreros/Trabajadores Agrícolas y Procesamiento de Alimentos

(Print or type in each field block – To include additional information, go to block # 28 – Please follow Step-By-Step Instructions)
(Favor de usar letra de molde en la solicitud – Para incluir información adicional vea el punto # 28 – Favor de seguir las instrucciones paso-a-paso)

| 1. Employer's and/or Agent's Name and Address (Number, Street, City, State and Zip Code / Nombre y Dirección del Empleador/Patrón y/o Agente (Número, Calle, Ciudad, Estado y Código Postal ): |
|---|

Marin J. Corp.
2148 N. Torrington Rd.
Avon Park, FL 33825

a) Federal Employer Identification Number (FEIN) / Número federal de Identificación del Empleador:

█████████

b) Telephone Number / Número de Teléfono:

(229) 456-1897

c) Fax Number / Número de Fax:

N/A

d) E-mail Address / Dirección de Correo Electrónico:

marincorp2015@outlook.com

**2. Address and Directions to Work Site / Domicilio y Direcciones al lugar de trabajo:**

Marin J. Corp. will be working in Dunklin County in the state of Missouri. The harvesting itinerarary with address to work-site can be found in Attachment #2.

Marin J. Corp. trabajara en el condado de Dunklin en el estado de Missouri El itenirario de cosecha con los domicilios de trabajo estan adjuntos en accesroio #2.

**3. Address and Directions to Housing / Domicilio y Direcciones al lugar de vivienda:**

1. 84 West Motel
   1433 St. Francis
   Kennett, MO 63857

a) Description of Housing / Descripción de la vivienda:
1. 20 Motels rooms will be used to house 80 workers.

*See Attachment #3 for Continuation and Spanish Translation
*Vea Accesorio #3 para Continuacion y Traduccion en Español

---

**Nos. 4 through 8 for STATE USE ONLY**
**Números 4 a 8 para USO ESTATAL**

**4. SOC (O*NET/OES) Occupational Code / Código Industrial:**

a. SOC (ONET/OES) Occupational Title / Título Ocupacional

**5. Job Order No. / Num. de Orden de Empleo:**

**6. Address of Order Holding Office (include Telephone number) / Dirección de la Oficina donde se radico la oferta (incluya el número de teléfono):**

a. Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (Incluya el número de teléfono de su línea directa).

**7. Clearance Order Issue Date / Fecha de Emisión de la Orden de Empleo:**

**8. Job Order Expiration Date / Fecha de Vencimiento o Expiración de la Orden de Empleo:**

**9. Anticipated Period of Employment / Periodo anticipado o previsto de Empleo:**

From / Desde: 06/25/2018   To / Hasta: 10/20/2018

**10. Number of Workers Requested / Número de Trabajadores Solicitados:**

80 WORKERS/80 TRABAJADORES

**11. Anticipated Hours of Work per Week / Horas Anticipadas/Previstas de Trabajo por Semana. Total: 36 HOURS/36 HORAS**

| | |
|---|---|
| Sunday / Domingo 0 | Thursday /Jueves 6 |
| Monday / Lunes 6 | Friday / Viernes 6 |
| Tuesday / Martes 6 | Saturday / Sábado 6 |
| Wednesday / Miércoles 6 | |

**12. Anticipated range of hours for different seasonal activities: / Rango previsto de horas par alas diferentes actividades de la temporada:**

7:00 A.M.- 1:00 P.M.

**13. Collect Calls Accepted from: / Aceptan Llamadas por Cobrar de:**

Employer / Empleador:   Yes / Si ☐   No ☑

14. Describe how the employer intends to provide either 3 meals a day to each worker or furnish free and convenient cooking and kitchen facilities for workers to prepare meals / Describa cómo el empleador tiene la intención de ofrecer, ya sea 3 comidas al día a cada trabajador, o proporcionar gratuitamente instalaciones para cocinar.

The employer will provide three (3) meals per day:  breakfast, lunch, and dinner.  The employer will charge each workers $12.26 per day for the three (3) meals.

El patron le proporcionará  tres (3) comidas por dia a cada trabajador:  Desayuno, almuerzo, y cena.  El empleador le cobrara al trabajador $12.26 por dia por las tres (3) comidas.

15. Referral Instructions and Hiring Information  / Instrucciones sobre cómo Referir Candidatos/Solicitantes - (Explain how applicants are to be hired or referred, and the Employer's/Agent's available hour to interview workers / Explique cómo los candidatos serán contratados o referidos, y las horas disponibles del empleador/agente para entrevistar a los trabajadores). See instructions for more details / Vea las instrucciones para más detalles.

All referrals are to be made to Jorge Marin by calling (229) 456-1897. Collect calls will not be accepted. All referrals are encouraged to contact their nearest career center prior to contacting the employer. The employer will contact all applicants, who have submitted an application, by phone, to conduct an interview. Prior to referral, each applicant should read, or have read to them a copy of the job order. All applicants should have a clear understanding of the terms and conditions of employment as noted in the job order. All applicants, if hired, are expected to work for the total period of employment as stated in the job order. All applicants, if hired, should be available for work as described in the "Job Activities" section in the job order. All applicants referred to the employer, if hired, will provide the following:  original identification and employment eligibility documents.

Employer will be available Monday to Thursday from 10:00 A.M. to 12:00 P.M. and from 1:00 P.M. to 2:00 P.M., to conduct interviews of referred workers, at no cost to the worker.
*See Attachment #15

16.  Job description and requirements / Descripción y requisitos del trabajo:

   *See Attachment #16
   *Vea Accesorio #16

1.  Is previous work experience preferred? / Se prefiere previa experiencia?   Yes / Si ☒   No ☐   If yes, number of months preferred. / Si es así, numero de meses de experiencia: 1 month verifiable experience in fruit or vegetable commercial harvesting

2.  Check all requirements that apply:

☐ Certification/License Requirements / Certificación/Licencia Requisitos
☐ Driver Requirements / Requisitos del conductor
☐ Employer Will Train / Empleador entrenará o adiestrará
☐ Extensive Sitting / Estar sentado largos ratos
☒ Exposure to Extreme Temp. / Expuesto a Temperaturas Extremas
☒ Lifting requirement / Levantar o Cargar _0-75 lbs./libras
☒ Repetitive Movements / Movimientos repetitivos

☐ Criminal Background Check / Verificación de antecedentes penales
☐ Drug Screen / Detección de Drogas
☒ Extensive Pushing and Pulling / Empujar y Jalar Extensamente
☒ Extensive Walking / Caminar por largos ratos
☒ Frequent Stooping / Inclinándose o agachándose con frecuencia
☐ OT/Holiday is not mandatory / Horas Extras (sobre tiempo) / Dias Feriados no obligatorio

RECEIVED

APR 17 2018

Missouri FLC Unit

**17. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas)**

| Crop Activities / Cultivos | Hourly Wage / Salario por Hora | Piece Rate / Unit(s) / Pago por Pieza / Unidad(es) | Special Pay (bonus, etc.) / Pagos Especiales (Bono, etc.) | Deductions* / Deducciones | Yes/Si | No | Pay Period / Periodo de Pago |
|---|---|---|---|---|---|---|---|
| WATERMELON CANTALOUPE | $13.42 $13.42 | $ N/A N/A | n/a n/a | Social Security / Seguro Social | ☑ | ☐ | Weekly / Semanal |
| Field Cutters | $ n/a | $ 20.00 per bus paid to group | n/a | Federal Tax / Impuestos Federales | ☑ | ☐ | ☒ |
| Field Loaders | $ n/a | $ 80 per bus, paid to group | n/a | State Tax /Impuestos Estatales | ☑ | ☐ | Bi-weekly/ Quincenal |
| Drivers | $ n/a | $7.00 per round trip from field to packing shed | n/a | Meals / Comidas | ☐ | ☒ | ☐ |
| Packing Shed Unloaders | $ n/a | $ 20 per bus, paid to group | n/a | Other (specify) / Otro (especifica) | ☒ | ☐ | Monthly/Mensual |
| Packing Shed Line Worker | n/a | $60 per bus, paid to group | n/a | | | | ☐ |
| | | | | | | | Other/Otro ☐ |

**18. More Details About the Pay / Mas Detalles Sobre el Pago:**

    *See Attachment #18

**19. Transportation Arrangements / Arreglos de Transportación**

All employer provided worker transportation meets the requirements of applicable Federal, State, and Local Laws and Regulations. All workers will be picked up every morning at the living facilities mentioned on Item #3 of ETA form 790.
*See Attachment #19

Todo el transporte que el patron proporcione para el trabajador, cumple con los requisitos de las regulaciones y leyes aplicables, federales, estatales, y locales. Recogerán a todos los trabajadores cada mañana en las viviendas mencionadas en el artículo #3 de la forma ETA 790.
*Vea Accesorio #19

RECEIVED

APR 17 2018

- 4 -

Missouri FLC Unit

20. Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, and/or pay workers for this (these) crop activity (ies)? / ¿Es la práctica habitual usar Contratistas de Trabajo Agrícola para reclutar, supervisar, transportar, dar vivienda, y/o pagarle a los trabajadores para este(os) tipo(s) de cosecha(s)?    Yes / Sí    ☐    No ☑

If you have checked yes, what is the FLC wage for each activity? / Si contesto "Sí," cuál es el salario que le paga al Contratista de Trabajo Agrícola por cada actividad?

---

21. Are workers covered for Unemployment Insurance? / ¿Se le proporcionan Seguro de Desempleo a los trabajadores?    Yes/Sí ☒    No ☐

  *THIS ONLY APPLIES TO DOMESTIC WORKERS

22. Are workers covered by workers' compensation? / ¿Se le provee seguro de compensación/indemnización al trabajador:    Yes/Sí ☒    No ☐

23. Are tools, supplies, and equipment provided at no charge to the workers? / ¿Se les proveen herramientas y equipos sin costo algun o a los trabajadores?
    Yes/Sí ☒    No ☐

---

24. List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers. (If there are no such arrangements, enter "None".) / Enumere todos los acuerdos o convenios hechos con los propietarios del establecimiento o sus agentes para el pago de una comisión u otros beneficios por ventas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, i ndique "Ninguno".)

    **NONE/NINGUNO**

---

25. List any strike, work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed.  (If there are no such incidents, enter "None".) / Enumere toda huelga, paro o interrupción de operaciones de trabajo por parte de los empleados en el lugar de empleo. (Si no hay incidentes de este tipo, indique "Ninguno".)

    **NONE/NINGUNO**

RECEIVED

APR 1 7 2018

Missouri FLC Unit

26. Is this job order to be placed in connection with a future Application for Temporary Employment Certification for H–2A workers? / ¿Esta orden de empleo ha sido puesta en conexión con una futura solicitud de certificación de empleo temporal para trabajadores H-2A?

Yes/Si ☒   No ☐

27. Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job. / Certificación del Empleador. Esta orden de trabajo describe los términos y condiciones del empleo que se le ofrece. y contiene todos los términos y condiciones materiales ofrecidos.

Jorge Marin/President

Employer's Printed Name & Title / Nombre y Título en Letra de Molde/Imprenta del Empleador

_Jorge Marin C._

Employer's Signature / Firma y Título del Empleador

04/17/2018

Date / Fecha

**READ CAREFULLY**, In view of the statutorily established basic function of the Employment Service as a no-fee labor exchange, that is, as a forum for bringing together employers and job seekers, neither the Employment and Training Administration (ETA) nor the State agencies are guarantors of the accuracy or truthfulness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the American Job Center constitute a contractual job offer to which the American Job Center, ETA or a State agency is in any way a party.

**LEA CON CUIDADO**, En vista de la función básica del Servicio de Empleo establecida por ley, como una entidad de intercambio laboral sin comisiones, es decir, como un foro para reunir a los empleadores y los solicitantes de empleo, ni ETA ni las agencias del estado pueden garantizar la exactitud o veracidad de la información contenida en las órdenes de trabajo sometidas por los empleadores.  Ni ninguna orden de trabajo aceptado o contratado en el Centro de Carreras (American Job Center) constituyen una oferta de trabajo contractuales a las que el American Job Center, ETA o un organismo estatal es de ninguna manera una de las partes.

**PUBLIC BURDEN STATEMENT**
The public reporting burden for responding to ETA Form 790, which is required to obtain or retain benefits (44 USC 3501), is estimated to be approximately 60 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and reviewing the collection. The public need not respond to this collection of information unless it displays a currently valid OMB Control Number. This is public information and there is no expectation of confidentiality.  Send comments regarding this burden estimate or any other aspect of this collection, including suggestions for reducing this burden, to the U.S. Department of Labor, Employment and Training Administration, Office of Workforce Investment, Room C-4510, 200 Constitution Avenue, NW, Washington, DC 20210.

**DECLARACION DE CARGA PÚBLICA**
La carga de información pública para responder a la Forma ETA 790, que se requiere para obtener o retener beneficios (44 USC 3501), se estima en aproximadamente 60 minutos por respuesta, incluyendo el tiempo para revisar las instrucciones, buscar fuentes de datos existentes, recopilar y revisar la colección. El público no tiene por qué responder a esta recopilación de información a menos que muestre un número de control OMB válido. Esta información es pública y no hay ninguna expectativa de confidencialidad. Envíe sus comentarios acerca de esta carga o cualquier otro aspecto de esta colección, incluyendo sugerencias para reducir esta carga, al U.S. Department of Labor, Employment and Training Administration, Office of Workforce Investment, Room C-4510, 200 Constitution Avenue, NW, Washington, DC 20210.

RECEIVED

APR 17 2018

Missouri FLC Unit

28.  Use this section to provide additional supporting information (including section Box number).  Include attachments, if necessary. / Utilice esta sección para proporcionar información adicional de apoyo; incluya  el numero de la sección e incluya  archivos adjuntos, si es necesario.

RECEIVED

APR 1 7 2018

Missouri FLC Unit

**20 CFR 653.501**
**Assurances**

## INTRASTATE AND INTERSTATE CLEARANCE ORDER

The employer agrees to provide to workers referred through the clearance system the number of hours of work per week cited in Item 11 of the clearance order for the week beginning with the anticipated date of need, unless the employer has amended the date of need at least 10 working days prior to the original date of need by so notifying the Order-Holding Office (OHO). If the employer fails to notify the OHO at least 10 working days prior to the original date of need, the employer shall pay eligible workers referred through the intrastate/interstate clearance system the specified hourly rate or pay, or in the absence of a specified hourly rate or pay, the higher of the Federal or State minimum wage rate for the first week starting with the original anticipated date of need. The employer may require workers to perform alternative work if the guarantee is invoked and if such alternative work is stated on the job order.

The employer agrees that no extension of employment beyond the period of employment shown on the job order will relieve the employer from paying the wages already earned, or specified in the job order as a term of employment, providing transportation or paying transportation expenses to the worker's home.

The employer assures that all working conditions comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration and other employment-related laws.

The employer agrees to expeditiously notify the OHO or State agency by telephone immediately upon learning that a crop is maturing earlier or later, or that weather conditions, over recruitment, or other factors have changed the terms and conditions of employment.

The employer, if acting as a farm labor contractor, has a valid farm labor contractor registration certificate.

The employer assures the availability of no cost or public housing which meets applicable Federal and State standards and which is sufficient to house the specified number of workers requested through the clearance system.

The employer also assures that outreach workers shall have reasonable access to the workers in the conduct of outreach activities pursuant to 20 CFR 653.107.

Employer's Name   Jorge Marin                        Date: 04/17/2018

Employer's Signature _Jorge Marin B_

**Besides the material terms and conditions of the employment, the employer must agree to these assurances if the job order is to be placed as part of the Agricultural Recruitment System. This assurance statement must be signed by the employer, and it must accompany the ETA Form 790.**

RECEIVED

APR 17 2018

Missouri FLC Unit

- 8 -

**Attachment #3**
The employer will provide free housing to those workers who are not able to return to their residence within the same day which meets applicable local, state, and federal housing standards. However, the employer will require workers to reimburse the employer for damage caused to the housing by the individual worker(s) found to have been responsible for damage which is not the result of normal wear and tear related to habitation. Workers will be responsible for maintaining housing in a neat, clean manner, as well as follow the housing rules which are attached. Female workers will be provided separate bathroom facilities.

*El patrón proporcionará vivienda gratuita a los trabajadores que no puedan volver a su residencia dentro de el mismo día que que cumpla con los estándares locales, estatales, y federales de viviendas. Sin embargo, el patrón requerirá a los trabajadores reembolsar al patrón por daños causados a la vivienda hechos por los trabajadores que se encuentren responsible por haber hecho los daños que no sean el resultado del desgaste normal y de rasgónes relacionados con la habitación. Los trabajadores serán responsables de mantener la vivienda de una manera aseada, limpia, y seguir las reglas de la vivienda que se encuentran atadas a esta forma. A las trabajadoras de sexo femenino, se les proporcionará un baño separado.*

Family Housing: (Check the appropriate box)
    [X] Family housing is not available and the provision of family housing is not a prevailing practice in the area of intended employment.
    [ ] Free family housing is available.
    [ ] Family housing is available. The provision of family housing is not a prevailing practice in the area of intended employment. Families will be charged _____ per week for utilities.

*Vivienda familiar: (Compruebe la caja apropiada)*
    *[X] Las viviendas de familia no están disponible y la disposición de las viviendas de familia no son una práctica que prevalece en está area de empleo previsto.*
    *[ ] Las viviendas de familia gratuitas si están disponible.*
    *[ ] Las viviendas de Familia si están disponible. La disposición de las viviendas de familia no son una práctica que prevalece en está area de empleo previsto. Las familias serán cobradas _____ por semana para cubrir el costo de las utilidades.*

**Attachment #11**
A copy of the work contract or a copy of the ETA 790 in lieu of a work contract and any modifications will be provided to the worker on the day the worker commences employment or as soon as practically possible.

*Una copia del contrato de trabajo o una copia del ETA 790 en lugar de un contrato de trabajo y cualquier modificación será proporcionada al trabajador en el día que el trabajador comienza el empleo o lo mas pronto como prácticamente sea posible.*

RECEIVED

APR 1 2018

Missouri FLC Unit

Attachments to ETA 790

**Attachment #11 (continued)**
Employer will offer work on Sunday, but employee is not required to work on Sunday.

*El patrón ofrecerá el trabajo el domingo, pero no requieren al empleado trabajar el domingo.*

The employer will keep accurate and adequate records of each worker.   The worker, worker's representative, and the any authorized representative of the secretary of Labor will be given access to the records of the worker's earnings.

*El patrón guardará expedientes exactos y adecuados de cada trabajador. Se le dara a el trabajador, el representante del trabajador, y cualquier representante autorizado de la secretaria del trabajo el acceso a los expedientes de las ganancias del trabajador.*

The employer will provide each worker an Hours and Earnings Statement that meets the requirements of the Federal and Missouri State Requirements. In accordance with Departmental regulations 20 CFR sec. 655.122(k) the employer will furnish the worker on or before each payday in one or more written statements the following information:
1.   The worker's total earning for the pay period.
2.   The worker's hourly rate and/or piece rate pay.
3.   The hours of employment offered to the worker (showing offers in accordance with the Three-fourths Guarantee as determined in paragraph (i) of this section, separate from any hours offered over and above the guarantee.)
4.   The hours actually worked by the worker.
5.   An itemization of all deductions made from the worker's wages.
6.   If piece rates are used, the units produced daily;
7.   Beginning and ending date of the pay period;
8.   The employer's name, address, and FEIN.

*El patrón proporcionará a cada trabajador Una Declaración de Las Ganancias y Las Horas Trabajadas que cumpla con los requisitos Federales y del estado de Missouri.   De acuerdo con las regulaciones Departamentales 20CFR sec. 655.122(k) el patron le dara a cada trabajador en el dia de pago o antes en una o mas formas por escrito la informacion siguente:*
*1.   Las ganancias total para el period de pago del trabajador.*
*2.   El pago de redito por hora y/o redito de pago por pieza del trabajador.*
*3.   Las horas ofrecidas al trabajador (que enseñen las ofertas de acuerdo con la garantia de ¾ del contrato, como es determinado en parafo (i) en esta seccion, aparte de calquier horas ofrecidas que sean mas o menos de esta guarantia.)*
*4.   Las horas actuals que sean trabajadas por el trabajador.*
*5.   Una lista detallada de todas las deducciones hechas del pago del trabjador.*
*6.   Si redito por pieza es usado, las unidades producidas por dia;*
*7.   La fecha que comienza y termina el periodo de pago;*
*8.   El nombre del empleado, domicilio, y FEIN.*

**Attachment #15**
*Todas las remisiones deben ser hechas a Jorge Marin, llamando al (229) 456-1897.*
*Llamadas por cobrar no serán aceptadas.   Todos los remitantes deben contactar* RECEIVED

2

MISSOURI PLC Unit

**Attachment #15 (continued)**

*a su centro de carreras más cercano antes de entrar en contacto con al patrón. El patrón entrará en contacto con todos los aspirantes que han presentado una solicitud, por teléfono, para conducir una entrevista. El patrón estara disponible Lunes a Jueves de las 10:00 P.M. al las 12:00 p.m. y de 1:00 P.M a 2:00 P.M. para las entrevistas de los trabajadores referidos, sin ningun costo al trabajador.*

*Antes de la remisión cada aspirante debe leer o que se le haiga leído una copia de la orden de trabajo. Todos los aspirantes deben tener un entendimiento claro sobre las condiciones del empleo según lo observado en la orden de trabajo. Se espera que todos los aspirantes trabajen para el periodo total de empleo según lo indicado en la orden de trabajo. Todos los aspirantes deben estar disponibles y estar a la discreción del patron para el trabajo según lo descrito en la sección de las Actividades del Trabajo en la orden de trabajo.   Todos los aspirantes refiridos al patrón, si son empleados, proporcionar lo siguiente:   identificación original y documentos de elegilibilidad para el trabajo.*

**Attachment #16**

The worker will perform job duties as assigned by supervisor. They will vary from time to time depending on crop ripening and weather. The watermelon harvesting is temporary and will last from June to October.

<u>Watermelon Hand Harvesting</u>-In order to perform this kind of work, the worker must be able to walk down the field row and use a knife to hand cut ripe watermelons off the vine for harvesting.   The watermelons are then loaded in a bus by forming part of an assembly line, in which the first worker bends down picks up the watermelon and it is passed on to consecutive workers by passing, catching, lifting, until it reaches the worker on the bus, who then sets it down and stacks them until the bus is considered full.

<u>Pumpkin Hand Harvesting</u>-In order to perform this kind of work, the worker must be able to walk down the field row and use a pair of loppers to hand cut ripe pumpkins off the vine for harvesting.   The pumpkins are then loaded in a bus by forming part of an assembly line, in which the first worker bends down picks up the watermelon and it is passed on to consecutive workers by passing, catching, lifting, until it reaches the worker on the bus, who then sets it down and stacks them until the bus is considered full.

<u>Cantaloupe Hand Harvesting</u>- In order to perform this kind of work, the worker must be able to walk down the field row and find the ripe cantaloupe based on texture and color. The ripe cantaloupes are picked off the vine by hand.   The cantaloupes are then loaded in a bus by forming part of an assembly line, in which the first worker bends down picks up the watermelon and it is passed on to consecutive workers by passing, catching, lifting, until it reaches the worker on the bus, who then sets it down and stacks them until the bus is considered full.

<u>Watermelon, Pumpkin, and Cantaloupe Packing</u>- The watermelon, pumpkin, or cantaloupe is transported by bus to the packing shed.   Upon its arrival, it is unloaded by

RECEIVED 3

2018

Missouri PLC Unit

**Attachment #16 (continued)**

a group of workers and placed on a conveyer belt.  The group of workers on the conveyer belt are responsible for sorting, labeling, and packing the watermelons, pumpkins, and cantaloupes in cardboard containers.   While the workers are waiting on the next load of watermelons to arrive, they will be responsible for assembling cardboard containers.

The worker must be able to work outside for 6 hours a day in all kinds of weather including, but not limited to extreme cold and hot conditions, direct sunlight, and rain. Workers must have the required physical strength and endurance to repeat the process rapidly and skillfully involved in this type of work.  Workers will perform prolonged walking, bending, stooping, reaching, pushing, pulling, lifting, and carrying 0-75 lbs. Due to the nature of this type of work, there will be a Probationary Period of six (6) days beginning on the first day of employment for the employee to acclimate to the job specifications listed under the Job Descriptions and Requirements. The worker will be given specific instructions as to how to properly perform the work specified in the Job Description and Requirements Section on the first day of work.   Workers who do not perform the work as specified, may be terminated.

The employer will provide the tools necessary to perform the described job duties without charge to the worker.   The employer will charge the worker for reasonable costs related to the worker's refusal or negligent failure to return the tools or due to such worker's willful damage or destruction of the tools.

*El trabajador realizará deberes asignados según las instrucciones dadas por su supervisor.  Los deberes varian de tiempo a tiempo conforme esta el clima y la madurez del la cosecha.   La cosecha de sandia es temporal y dura de Abril a Mayo.*

*<u>Cosecha a mano de Sandia</u> -   Para realizar esta clase de trabajo, el trabajador debe caminar por los surcos del fil y usando una navaja, cortar la sandia madura de la viña para cosecharla.   Despues, los trabajadores forman parte de un linea de asemblea.   El primer trabajador recoje la sandia del suelo y la va pasando, agarrando, y levantando hasta llegar al autobus.   Se la entregan al trabajador que esta adentro del autobus y este va apilando las sandias hasta que el camion es considerado lleno.*

*<u>Cosecha de la mano de calabaza</u>-para realizar este tipo de trabajo, el trabajador debe ser capaz de caminar por la hilera de campo y usar un par de Loppers para cortar las calabazas maduras de la viña para su cosecha.   Las calabazas entonces se cargan en un autobús formando parte de una línea de montaje, en la cual el primer trabajador dobla abajo recoge la sandia y se pasa encendido a los trabajadores consecutivos pasando, cogiendo, levantando, hasta que alcanza al trabajador.*

*<u>Cosecha a mano de Melon</u> -   Para realizar esta clase de trabajo, el trabajador debe caminar por los surcos del fil y encontrar los melones maduras en base a su color y textura.   Los melones maduros se piscan de la mata a mano.   Despues, los trabajadores*

RECEIVED

4

APR 17 2018

Missouri FLC Unit

Attachments to ETA 790

**Attachment #16 (continued)**

*forman parte de un linea de asemblea.  El primer trabajador recoje el melon del suelo y lo va pasandos a los otros trabajadores, agarrando, y levantando hasta llegar al autobus.  Se la entregan al trabajador que esta adentro del autobus y este va apilando los melones hasta que el camion es considerado lleno.*

*<u>Embalaje de la sandía, calabaza, y melon</u>- la sandía, la calabaza, y los melones son transportados en autobús a la vertiente del embalaje.  A su llegada, son descargados por un grupo de trabajadores y colocado en una cinta transportadora.  El grupo de trabajadores en la cinta transportadora es responsable de clasificar, etiquetar y empacar la sandía, calabaza y melon en recipientes de cartón.  Mientras los trabajadores están esperando que llegue su próxima carga, serán responsables de formar los contenedores de carton.*

*El trabajador debe poder trabajar afuera por 6 horas al día en todo tipo de clima incluyendo, pero no limitado a condiciones extremas de frío y calor, luz solar directa, y lluvia. Los trabajadores deben tener la fuerza física requerida y la resistencia para repetir el proceso, rápidamente y hábilmente, involucrados con este tipo de trabajo. Los trabajadores realizarán caminatas prolongadas, estaran doblados, agachados, alcanzaran, empujaran, tiraran, llevaran, y levantaran peso de 0-75 libras. Debido a la naturaleza de este tipo de trabajo, habrá un período de prueba de cinco seis (6) días, comenzando con el primer día de empleo, para que el empleado se adapte a las especificaciones de trabajo enumeradas bajo las Descripciones y Requisitos del Trabajo. En el primer día de trabajo, se le dará al trabajador instrucciones específicas cómo realizer correctamente el trabajo especificado en la Sección de Descripción y Requisites del Trahajo.  Los trabajadores que no realizan el trabajo como se especifica en esta petición pueden ser terminados.*

*El patrón proporcionará las herramientas necesarias para realizar los deberes escritos del trabajo. El patrón le cobrara una quota rasonable al trabajador por los costos relacionados con la denegación o la falta negligente del trabajador de volver las herramientas o debido al daño voluntarioso o a la destrucción de tal herramientas por el trabajador.*

**Attachment # 18**

a. To comply with its obligation under § 655.122(1), an employer must offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the federal or state minimum wage, except where a special procedure is approved for an occupation or specific class of agricultural employment.

*a. Para conformarse conlal obligación bajo § 655.122 (1), un patrón debe ofrecer, hacer publicidad en él reclutamiento, y pagar un salario que sea el más alto del AEWR, el*

RECEIVED

5

FEB 1 7 2018

Missouri FLC Unit

Attachments to ETA 790

**Attachment # 18 (continued)**

*salario de cada hora o la tarifa de pedazo que prevalece, el salario acordado en la negociación colectiva, o el federal o el salario mínimo estatal, excepto donde está aprobado un procedimiento especial para una ocupación o una clase específica de empleo agrícola.*

b.   If the prevailing hourly wage rate or piece rate is adjusted during a work contract, and is higher than the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, in affect at the time the work is performed; the employer must pay that higher prevailing wage or piece rate upon notice to the employer by the department.

*b. Si la tarifa de salario de cada hora que prevalece o la tarifa de pedazo se ajusta durante un contrato de trabajo, y es más alto de el más alto del AEWR, el salario que prevalece, el salario acordado de la negociación colectiva, o el salario mínimo Federal o Estatal, en effecto cuando se realiza el trabajo, el patrón deben pagar el salario que prevalece o la tarifa de pedazo más alta sobre aviso al patrón por el departamento.*

c. The OFLC Administrator will publish, at least once in each calendar year, on a date to be determined by the OFLC Administrator, the AEWRs for each State as a notice in the Federal Register.

*c. El administrador de OFLC publicará, por lo menos una vez en cada año civil, una fecha que se determinará por el administrador de OFLC, los AEWRs para cada estado como aviso en el registro federal.*

d. Most of the jobs associated with this employment are paid by the piece rate, however $13.42 per hour (or a higher or lower AEWR in effect at the time the work is performed) or a higher prevailing wage rate, if applicable, is guaranteed as a minimum for all hours worked during a pay period.   If the worker's total pay for the pay period from piece rate earnings and hourly wages divided by his total hours worked during that pay period results in average hourly earnings of less than the guaranteed hourly rate, the worker will be provided build-up pay to the guaranteed minimum hourly rate.

*d. La mayor parte de los trabajos asociados con este empleo son pagados por el índice de pedazo, sin embargo $13.42 por hora (o un AEWR más alto o más bajo en efecto en el momento en que se realiza el trabajo) o una tarifa de salario que prevalece más alta, si fuera aplicable, se garantiza como mínimo por todas las horas trabajadas durante un período de paga. Si la paga total del trabajador para el período de paga de ganancias de la tarifa de pedazo y de salarios por hora dividió por sus horas totales trabajadas durante ese período de paga resulta en un promedio de ganancia por hora menos que el precio por hora garantizado, el trabajador será proveído pago de acumulación por la tarifa mínima garantizada.*

e. The employer will make the following deductions:   FICA taxes, income tax, cash advances, overpayment of wages, and charges for any loss to the employer due to the



Attachments to ETA 790

**Attachment # 18 (continued)**

workers damage or loss of equipment or housing items where it is shown that the worker is responsible, and any other deductions expressly authorized by the worker in writing. State income tax will be deducted.

*e. El patrón hará las deducciones siguientes: Los impuestos de FICA, el impuesto sobre la cantida de paga, los anticipos, el pago excesivo de salarios, y las cargas para cualquier pérdida al patrón debido a los trabajadores dañando o pérdida de artículos del equipo o de la vivienda donde se demuestra que el trabajador es responsable, y cualquiera otras deducciones sean autorizadas por el trabajador por escrito. Se deducirá impuesto sobre la cantida de paga estatal.*

f. Employer will not pay the worker a bonus based on quality picking or at the end of season.

*f. El patrón no pagará al trabajador una prima basada en la cosecha de la calidad o en finales de la cosecha.*

g. ¾ of Work Guarantee:   The employer will guarantee the worker employment for at least three-fourths of the workdays of the total period during which the work contract and all extensions thereof are in effect, beginning with the first workday after the arrival of the worker at the place of employment and ending on the expiration date specified in the work contract or in its extension, if any.   If the employer affords the worker during the total work contract period less employment than the required under this work guarantee, the employer shall pay such worker the amount which the worker should have earned had the worker in fact worked for the guaranteed number of days.   For purposes of this guarantee, a workday shall mean the number of hours in a work on a single workday, including the worker's Sabbath and federal holiday.   For purposes of meeting the guarantee, however, the worker shall not be required to work for more than the number of hour specified in this job order for a workday, or on the worker's Sabbath or federal holiday.   In determining whether the guarantee of employment has been met, any hours which the worker fails to work during a workday when the worker is afforded the opportunity to do so by the employer and hours of work performed, shall be counted in calculating the employment guarantee. The employment guarantee may be abated by the employer before the expiration date specified in the work contract for reasons beyond the employees control due to an act of God employment before the end of the contract period or in the event the worker is terminated for lawful job-related reason.   The employer will not be liable for payment of the work guarantee with respect to an H-2A worker whom the Regional Administrator certifies is displaced because of the employer's compliance with the 50 percent rule.

*g. ¾ de la Garantía del Trabajo: El patrón garantizará el empleo por lo menos tres cuartos de los días laborables que se le ofrecen al trabajador durante el período total durante el cual el contrato de trabajo y todas las extensiones de eso están en efecto, comenzando con el primer día laborable después de la llegada del trabajador en el lugar del empleo y terminando en la fecha de vencimiento especificada en el contrato de*

RECEIVED

7

APR 17 2018

MISSOURI FLC UNE

Attachments to ETA 790

## Attachment # 18 (continued)

*trabajo o en su extensión, si la hay. Si el patrón produce al trabajador durante el plazo de ejecución total de trabajo menos empleo que requerido bajo esta garantía del trabajo, el patrón pagará a tal trabajador la cantidad que el trabajador hubiera ganado si el trabajador hubiera trabajado el número de días garantizados en el contrato. Con objeto de esta garantía, un día laborable significará el número de horas en un trabajo sobre un solo día laborable, incluyendo el día religioso del trabajador y el día de fiesta federal. Con objeto de resolver la garantía, el trabajador no sera required a trabajar más horas que el número de horas por día laboral especificadas en esta orden de trabajo, o en el día religioso, o el día de fiesta federal del trabajador. En la determinación de si, la garantía del empleo sera resuelta, cuando el trabajador no quiera trabajar durante un día laborable donde el patrón le haigo ofrecido trabajo y el trabajador no haigo quierido trabajar estas horas laborables de trabajo seran contadas en el cálculo de la garantía del empleo. La garantía del empleo se puede disminuir o ser cancelada por el patrón antes de la fecha de vencimiento especificada en el contrato de trabajo por razones más allá del control del patron o por fuerzas mayores. El patrón no será obligado para el pago de la garantía del trabajo con respecto a un trabajador de H-2A que el administrador regional certifique se desplace debido a la conformidad del patrón con la regla del 50 por ciento.*

h. Payroll periods will be weekly.

*h. Los períodos de nómina de pago serán semanales.*

i. The employer will provide workers referred through the interstate clearance system 36 hours of work for the week beginning with the anticipated date of need unless the employer has amended the date of need by notifying the local Job Service Office no later than 10 days before the date of need.   If the employer fails to notify the order-holding office, then the employer shall pay an eligible worker referred through the clearance system
$483.12, the appropriate wage alternative work if the guarantee cited in this section is invoked.

*i. El patrón proveerá a los trabajadores referidos a través del Interstate Clearance System 36 horas de trabajo empesando con la primera semana de la fecha anticipada de la necesidad a menos que el patrón haya enmendado la fecha de la necesidad notificando la oficina local del servicio del trabajo por lo menos 10 días antes de la fecha de la necesidad. Si el patrón no puede notificar la oficina que tiene la orden de trabajo, el patrón pagará a un trabajador elegible referido a través del Interstate Clearance System $483.12, el trabajo alternativo del salario apropiado si la garantía citada en esta sección se invoca.*

## Attachment # 19

After the worker has completed 50% of the work period, the employer will reimburse the worker for the cost of transportation and subsistence expenses of at least $12.26 per day

RECEIVED

8

MISSOURI PLC Unit

Attachments to ETA 790

with no receipts and a maximum of $51.00 per day with receipts. This covers the cost
**Attachment # 19 (continued)**
from the place of recruitment to the place of employment. Upon completion of the work
contract the employer will pay reasonable costs of return including transportation and
subsistence from place of employment to place of recruitment. The employer will pay
$12.26 per day with no receipts and up to $51.00 per day with receipts. This is true,
except when the worker will not be returning to the place of recruitment, due to
subsequent employment with another employer, who agrees to pay such costs. In this
case the employer will only pay for transportation and subsistence to the next job. The
amount of the transportation payment will be equal to the most economical and
reasonable similar common carrier transportation charges for the distance involved.
These arrangements apply only to workers for whom the employer is legally obligated to
supply housing.

Free transportation will be provided from the employer provided housing to the work site
and back, for workers living in that housing and for commuting workers, if they need
transportation to the harvesting site.

*Después de que el trabajador haya terminado el 50% del período del trabajo, el patrón
reembolsará al trabajador para el coste de transporte y de gastos de estancia de por lo
menos $12.26 por día sin recibos y un máximo de $51.00 por día con los recibos. Esto
cubre el coste del lugar del reclutamiento al lugar del empleo. Sobre la terminación del
contrato de trabajo el patrón pagará costes razonables de vuelta incluyendo el
transporte y de subsistencia del lugar del empleo al lugar del reclutamiento. El patrón
pagará $12.26 por día sin recibos y hasta $51.00 por día con los recibos. Esto es verdad,
a menos que cuando el trabajador no vuelva al lugar del reclutamiento, debido al empleo
subsecuente con otro patrón, que acuerda pagar tales costos. En este caso el patrón
pagará solamente el transporte y la subsistencia al trabajo siguiente. La cantidad del
pago del transporte será igual a las cargas de transporte similares más económicas y
más razonables del portador común para la distancia implicada. Este arreglo se aplica
solamente a los trabajadores para quienes obligan al patrón legalmente a suministrar
vivienda. Transporte gratis será proporcionado de la vivienda proporcionada por el
patrón al sitio de trabajo, para los trabajadores que viven en las viviendas proveídas por
el patrón y para los trabajadores que viajan, si necesitan el transporte al sitio de
cosecha.*

## Additional Assurance Addendum

### Reporting Abandonment of Employment or Termination for Cause

The employer will report workers who, (a) voluntarily abandon employment before the
end of the contract period, or (b) workers who are terminated for cause, to the Chicago
National Processing Center, and H-2A workers to the Department of Homeland Security,
in writing or other approved method, not later than two (2) days after the abandonment or
termination occurs. Abandonment will be deemed to begin after a worker fails to report

RECEIVED
9
APR 1 7 2018
Missouri FLC Law

for work at the regularly scheduled time for five (5) consecutive working days without
**Reporting Abandonment of Employment or Termination for Cause (continued)**
the consent of the employer.   The employer will not be responsible for providing or
paying for reported workers (a) subsequent transportation and subsistence expenses, and
(b) the worker will not be entitled to the ¾ guarantee."

In the event of termination resulting from an Act of God, the employer will provide or
pay reasonable cost of return transportation and subsistence to the place of recruitment.

### *Adenda de Garantía Adicional*
#### *Reportando el Abandono de Empleo o Rescision Por Causa*
*El patrón divulgará los trabajadores que, (a) voluntariamente abandone el empleo antes
del final del plazo de ejecución, o (b) a los trabajadores que se terminan por causa, al
Centro de Proceso Nacional de Chicago, y los trabajadores de H-2A al Departamento de
Seguridad de Patria, por escrito o por otro método aprobado, no más tardo de (2) días
después del abandono o de la terminación. El abandono será juzgado después de que un
trabajador no se reporte al trabajo a la hora que este regularmente programada por
cinco (5) días laborables consecutivos sin el consentimiento del patrón. El patrón no será
responsable de proporcionar o de pagar trabajadores divulgados (a) el transporte y
gastos de estancia subsecuentes. y (b) no darán derecho el trabajador a la garantía del
¾. "*

*En el acontecimiento de la terminación que resulta de un acto de Dios, el patrón
proporcionará o pagará el coste razonable del transporte de regreso y de la subsistencia
al lugar de reclutamiento.*

### Regulation 655.122(0) Contract Impossibility
Contract Impossibility.   If before the expiration date specified in the work contract, the
services of the worker are no longer required due to an Act of God that makes the
fulfillment of the contract impossible, the employer may terminate the work contract.
Whether such an event constitutes a contract impossibility will be determined by the CO.
In the event of such termination of a contract, the employer must fulfill a three-fourths
guarantee for the time that has elapsed from the start of the work contract to the time of
its termination, as described in paragraph (i)(1) of this section.   The employer must
make efforts to transfer the worker to other comparable employment acceptable to the
worker, consistent with existing immigration law, as applicable.   If such transfer is not
affected, the employer must:

(1) Return the worker, at the employer's expense, to the place from which the
worker (disregarding intervening employment) came to work for the employer, or
transport the worker to the worker's next certified H-2A employer, whichever the worker
prefers;

(2) Reimburse the worker the full amount of any deductions made from the
worker's pay by the employer for transportation and subsistence expenses to the place of
employment; and

RECEIVED
10

MAY 1 1 2018

Missouri P.L.S. Unit

Attachments to ETA 790

## Regulation 655.122(0) Contract Impossibility(continued)

(3) Pay the worker for any costs incurred by the worker for transportation and daily subsistence to that employer's place of employment. Daily subsistence must be computed as set forth in paragraph (h) of this section. The amount of the transportation payment must not be less (and is not required to be more) than the most economical and reasonable common carrier transportation charges for the distances involved."

## Regulación 655.122 (0) Imposibilidades de Contrato

*(0) Imposibilidad del contrato. Si antes de la fecha de vencimiento especificada en el contrato de trabajo, los servicios del trabajador lla no se requieren por razones de otras fuerzas mayores que hagan el cumplimiento del contrato imposible, el patrón puede terminar al contrato de trabajo. Si tal acontecimiento constituye una imposibilidad del contrato será determinada por el CO. En caso de tal terminación de un contrato, el patrón debe satisfacer tres cuartos de la garantia por el tiempo que ha transcurrido del comienzo del contrato de trabajo al tiempo de su terminación, según lo descrito en el párrafo (i) (1) de esta sección. El patrón debe hacer esfuerzos para transferir al trabajador al otro empleo comparable aceptable por el trabajador, constante con ley existente de inmigración, como aplicable. Si tal transferencia no es afectada, el patrón debe:*

*(1) Devolver al trabajador, al costo del patrón, al lugar de el cual el trabajador (sin hacer caso del empleo de intervención) vino a trabajar para el patrón, o transporta al trabajador al patrón certificado siguiente de H-2A del trabajador, el cual el trabajador prefiere;*

*(2) Reembolsar al trabajador la cantidad completa de cualquier deducción que se haiga hecho de la paga del trabajador de parte del patrón para el transporte y los gastos de estancia al lugar del empleo; y*

*(3) Pagar al trabajador cualquier gastos qur haiga hecho el trabajador para la tranportacion y la subsistencia diaria al lugar del empleo de ese patrón. La subsistencia diaria se debe computar según lo dispuesto en el párrafo (h) de esta sección. La cantidad del pago del transporte no debe ser menos (y no se requiere para ser más) que las cargas de transporte más económicas y más razonables del portador común para las distancias implicadas."*

## §655.120 Offered Wage Rate:

(a) To comply with its obligation under §655.122(1), an employer must offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed upon collective bargaining wage, or the Federal or State minimum wage, except where a special procedure is approved for an occupation or a specific class of agricultural employment.

RECEIVED
11

Attachments to ETA 790

(b) If the prevailing hourly wage rate or piece rate is adjusted during a work
§655.120 **Offered Wage Rate:   (continued)**
contract and is highest of the AEWR, the prevailing wage, the agreed-upon collective
bargaining wage, or the Federal or State minimum wage, in effect at the time the work is
performed, the employer must pay the higher prevailing wage or piece rate, upon notice
to the employer by the Department.

(c) The OFLC Administrator will publish, at least once in each calendar year, on a
date to be determined by the OFLC Administrator, the AEWRs for each State as a
notice in the Federal Register.

*Tarifa de salario ofrecida §655.120:*
*(a) Para conformarse con su obligación debajo de §655.122 (1), un patrón debe
ofrecer, publicar en su reclutamiento, y pagar un salario que sea el más alto del AEWR,
el salario por hora o la tarifa de pedazo que prevalece, el salario convenido en la
negociación colectiva, o el Federal o el que indique el salario mínimo, excepto donde
está aprobado un procedimiento especial para una ocupación o una clase específica de
empleo agrícola.*

*(b) Si la tarifa de salario de cada hora que prevalece o la tarifa de pedazo se
ajusta durante un contrato de trabajo y es la más alta del AEWR, el salario que
prevalece, el salario acordado de la negociación colectiva, o el Federales o lo que indica
el salario mínimo, en efecto cuando se realiza el trabajo, el patrón deben pagar el
salario que prevalece o la tarifa de pedazo más alto, sobre aviso al patrón por el
Departamento.*

*(c) El Administrador de OFLC publicará, por lo menos una vez por año civil, una fecha
que se determinará por el Administrador de OFLC, el AEWRs para cada estado como
aviso en el Registro Federal.*

**Regulation 655.135(d) Fifty Percent Rule**
From the time the foreign workers depart for the employer's place of employment, it
must provide employment to any qualified, eligible U.S. workers who applies to the
employer until 50 percent of the period of the work contract has elapsed.   Start of the
work contract timeline is calculated from the first date of need stated on the *Application
for Temporary Employment Certification*, under which the foreign worker who is in the
job was hired.

*Regulación 655.135(d) Regla de Cincuenta Por Ciento*
*Desde el momento que salen los trabajadores extranjeros de el lugar de empleo del
empleador, el empleador debe proporcionar empleo a cualquier trabajador
Estadounidenses que aplique y que este calificado e elegible hasta que haya transcurrido
la mitad del período del contrato de trabajo. El comienzo de tiempo del contrato de
trabajo se calcula a partir de la primera fecha de necesidad indicada en la Solicitud de
Certificación de Empleo Temporal, bajo el cual fue contratado el trabajador extranjero.*

RECEIVED
12
1 7 2018

Attachments to ETA 790

## Regulation 20 CFR sec. 655.122(a) U. S. Worker Assurance

Prohibition against preferential treatment of aliens. The employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers. Job offers may not impose on U.S. workers any restrictions or obligations that will not be imposed on the employer's H-2A workers. This does not relieve the employer from providing to H-2A workers at least the same level of minimum benefits, wages, and working conditions which must be offered to U.S. workers consistent with this section.

## Regulación 20 CFR sec. 655.122(a) Aseguramiento de Trabajador Estadounidense

*Prohibición de tratamiento preferencial de los extranjeros. Oferta de empleo del empleador debe ofrecer a los trabajadores de Estados Unidos nada menos que los mismos beneficios, salarios y condiciones de trabajo que el empleador ofrece, se propone ofrecer, o proporcionará a los trabajadores H-2A. Ofertas de trabajo no pueden imponer a los trabajadores de los Estados Unidos cualquier restricciones o obligaciones que no se impondrá a los trabajadores H-2A del empleador. Esto no releva al empleador de proporcionar a los trabajadores H-2A por lo menos el mismo nivel de prestaciones mínimas, los salarios y las condiciones de trabajo que deben ser ofrecidas a los trabajadores estadounidenses consistentes con esta sección.*

RECEIVED

13

1 7 2018

Wisconsin PLC-Unit